CAMERON et al. v. FIRST NAT. BANK OF GALVESTON et al. (No. 7180.)

(Court of Civil Appeals of Texas. Galveston. March 16, 1917. Rehearing Denied April 5, 1917.)

1. CORPORATIONS ⬦➡361 — ACTION AGAINST DIRECTORS—FALSE REPORTS—SPECIAL FINDINGS—EVIDENCE.

In action against directors to recover amount of loan made to corporation upon misrepresentations in annual statements as to its financial condition, evidence *held* to sustain special findings for plaintiffs.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1506.]

2. CORPORATIONS ⬦➡363 — ACTION AGAINST DIRECTORS — FALSE REPORTS — REFUSAL TO DIRECT VERDICT—EVIDENCE.

In action against directors to recover amount of loan made to corporation upon misrepresentations in annual statements as to its financial

condition, evidence *held* sufficient to justify a refusal to direct verdict for defendants.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1506½, 1507.]

**3. CORPORATIONS ☞361 — ACTION AGAINST DIRECTORS—KNOWLEDGE OF FALSITY OF RE- .PORTS—EVIDENCE.**

Evidence that directors had occupied position for years and knew of methods of bookkeeping used by corporation, and that uncollectable accounts were included in annual financial statement with approval of board of directors, *held* sufficient to charge them with notice of falsity of statements, and that same were used to obtain credit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1506.]

**4. CORPORATIONS ☞361 — ACTION AGAINST DIRECTORS—AUTHORIZING FALSE REPORTS— EXERCISE OF DUE CARE—EVIDENCE.**

Evidence *held* to show that directors, in authorizing corporation's financial statements, used to obtain credit, failed to exercise ordinary care, and that the exercise of such care would have shown them the falsity of such statements.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1506.]

**5. CORPORATIONS ☞335—DIRECTORS' LIABILITY FOR FALSE REPORT PREPARED BY EMPLOYÉS.**

The fact that a corporation's financial statement used to obtain credit was prepared by employés under directors' control cannot relieve directors of liability for misrepresentations contained therein, in view of Rev. St. 1911, art. 1159, providing that "the directors shall have general management of the affairs of the corporation," and it was immaterial that they did not expressly authorize presentation of such statements for purpose of obtaining credit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1453.]

**6. CORPORATIONS ☞413 — DUTY OF DIRECTORS—STATUTE—"AFFAIRS OT THE CORPORATION."**

The borrowing of money in conducting corporation's business, and methods of obtaining loans, were "affairs of the corporation" within meaning of Rev. St. 1911, art. 1159, providing that "the directors shall have general management of the affairs of the corporation."

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1647–1649.]

**7. PRINCIPAL AND AGENT ☞159(2)—AGENT'S LIABILITY FOR FRAUD.**

An agent is as much responsible as his principal for fraud perpetrated on another in which the agent participated.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 606–612.]

**8. CORPORATIONS ☞335—DIRECTORS' LIABILITY FOR FALSE REPORTS.**

Directors, although agents of the corporation, are responsible for the truth of corporation's annual financial statements, sanctioned by them during a long-continued method of borrowing money on the faith of such statements.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1453.]

**9. CORPORATIONS ☞335—DIRECTORS' LIABILITY FOR FALSE REPORT — GENERAL RULE — NEGLIGENT MISMANAGEMENT.**

The general rule that mere negligent mismanagement of a corporate business will not render directors liable to creditors will not relieve directors from liability for false financial statements sanctioned by them for the purpose of obtaining loans.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1453.]

**10. CORPORATIONS ☞354—NONRESIDENT DIRECTOR—LIABILITY FOR FALSE REPORTS.**

The fact that a director resided out of the state did not make creditors negligent in relying on assumption that he sanctioned issue of corporation's financial statements made under his name, where the director continued to exercise his duties, and knowingly allowed himself to be held out to the public as a governing officer.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1496.]

**11. APPEAL AND ERROR ☞1067 — HARMLESS ERROR—REFUSAL OF CHARGE NOT AFFECTING RESULT.**

Where jury might have found all facts stated in defendants' requested charge to be true and still found against them, without making findings inconsistent, refusal of the charge was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4229; Trial, Cent. Dig. § 475.]

**12. APPEAL AND ERROR ☞263(1) — INSTRUCTIONS—DAMAGES—FAILURE TO EXCEPT.**

Where defendants did not except to charge naming amount of damages recoverable, as required by article 1971, they cannot complain thereof on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1516.]

**13. APPEAL AND ERROR ☞216(1) — INSTRUCTIONS—DAMAGES—FAILURE TO REQUEST.**

Where defendants failed to ask for the submission of issue as to amount of damages, on appeal they cannot complain of the given charge relating thereto.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 627–641, 660, 662–676.]

**14. FRAUD ☞59(3) — ACTION — MEASURE OF DAMAGES.**

In fraud cases, in which by misrepresentation a person has been induced to purchase property, the measure of damages is generally the difference between the value of the property and amount paid therefor.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 62.]

**15. CORPORATIONS ☞353 — ACTION AGAINST DIRECTOR OF BANKRUPT CORPORATION — AMOUNT OF RECOVERY.**

Where all visible definite assets of bankrupt corporation had been sold, satisfying 40 per cent. of plaintiffs' claim, in action against directors for false representation of corporation's financial condition, plaintiffs were not required to accept speculative value of claims in trustee's pending suits, or to await final result thereof.

Appeal from District Court, Galveston County; Robt. G. Street, Judge.

Suit by the First National Bank of Galveston and others against W. W. Cameron and others. Judgment for plaintiffs, and defendants· appeal. Affirmed.

Sleeper, Boynton & Kendall, of Waco, and McDonald & Wayman, of Galveston, for appellants Cameron and Bolton. J. N. Gallagher and S. E. Stratton, both of Waco, for appellant Slayden. J. D. Williamson, of Waco, Thompson, Knight, Baker & Harris, of

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Dallas, and J. B. & C. J. Stubbs, and Williams & Neethe, all of Galveston, for appellee First Nat. Bank of Galveston.

PLEASANTS, C. J. This suit was brought by appellee First National Bank of Galveston against W. W. Cameron, E. R. Bolton, W. J. Slayden, Tom Padgitt, S. F. Kirksey, S. W. Slayden, and S. F. Kirksey, Jr., to recover the sum of $25,000, with interest from October 7, 1911, at the rate of 6 per cent. per annum.

The following statement of the substance of the voluminous pleadings is believed to be sufficient for an understanding of the issues involved in the suit:

The petition alleges that the defendants above named composed the board of directors of the Slayden-Kirksey Woolen Mill of Waco, Tex., a manufacturing and trading corporation organized and chartered under the laws of this state, and that as such directors they made false and fraudulent representations of the financial condition of said corporation in financial statements issued by said corporation on December 31, 1909, and December 31, 1910, and on other dates prior to those just mentioned, which said statements were issued as a basis for credit and were presented to plaintiff bank by the defendant S. F. Kirksey, Jr., the vice president and manager of said woolen mill, for the purpose of obtaining a loan for said woolen mill from plaintiff; that, relying upon the truth of said statements and upon oral statements made by said Kirksey, plaintiff extended a line of credit of $40,000 to said woolen mill, and said amount was in fact loaned to said mill, for which it executed its notes to plaintiff as the money was obtained; the woolen mill subsequently became insolvent, owing plaintiff the sum of $40,000; that 40 per cent. of such indebtedness had been collected by plaintiff through proceedings in bankruptcy, and defendants, by reason of said false representations by which plaintiff was induced to extend said credit, became and are liable to plaintiff for the loss sustained by it in making said loans to the woolen mill.

It is further alleged that the defendants herein, as directors and officers of the said Slayden-Kirksey Woolen Mill during the years and times hereinabove mentioned, knew, and it was their duty to know, the truth of the history of said corporation and its financial status, and that all of them, during the times they were directors of said corporation, held themselves out as such to the public at large, and especially to this plaintiff, and they induced the public to rely on their connection with said alleged insolvent corporation, and caused the plaintiff, the First National Bank of Galveston, and others who dealt with said mill, to believe that the statements issued under their alleged direction were true statements, because of their names and standing in the financial and business world; and that they, and each of them,

knew, and that it was their duty to know, and with the exercise of reasonable diligence could have known, that said capital stock of said corporation had not been fully paid; that its machinery and real estate accounts were inflated and padded, and that its bills receivable and outstanding accounts, as shown by its books and financial statements, included worthless accounts, which in their knowledge were wholly valueless, and charging that said directors had the benefit of an audit made under date of October 31, 1906, which they alleged reflected the condition complained of, charging that the directors, and each of them, knew of the alleged system of the said Slayden-Kirksey Woolen Mill of causing said financial statements to be issued at the close of business each year, and that they, and each of them, well knew said statements were false, and that they, and each of them, sanctioned and continued the use of said false statements in the obtainment of credit and dealings on behalf of said mill through its officers and agents and brokers and in its commercial transactions, charging that the directors, and each of them, acted willfully and fraudulently in permitting the issuance, circulation, and use on behalf of said corporation, its officers and agents, of said financial statements so issued annually, as above set out; that if it should be found that defendants had not willfully and wrongfully made such financial statements, knowing the same to be false and with the intent to defraud, by reason of the positions which they held as directors of said corporation they were chargeable with knowledge that said financial statements were false in the particulars alleged, as by the exercise of reasonable diligence they would have ascertained facts which would have made known to them the falsity of the representations in said financial statements contained, as in plaintiff's amended petition alleged; and that said defendants wantonly, willfully, and recklessly sanctioned and permitted the issuance and use of false financial statements, and are therefore each liable to plaintiff.

That the woolen mill went out of business in 1912, bankruptcy proceedings being instituted, and plaintiff, as a creditor of said mill, proved up its notes and claim in bankruptcy against said mill, and had received 40 per cent. on its said notes and claim, and brings this suit, praying recovery against defendants personally for the difference between the original amount of its loan, or loans, made the Slayden-Kirksey Woolen Mill and the amount realized from the bankruptcy proceedings, alleging damages in the sum of $25,000, with interest thereon from October 7, 1911.

Defendants W. W. Cameron and E. R. Bolton, in their second amended answer, after general and special exceptions, which were overruled by the court, answered by general denial, and further denied specific-

ally each and every material allegation of fact in plaintiff's amended petition alleged as against these defendants and seeking to hold them liable herein, and alleging, together with other facts in their amended answer, that W. W. Cameron, upon the death of his father, Wm. Cameron, in 1898, together with his mother and sisters, inherited certain stock in the Slayden-Kirksey Woolen Mill, and after his disabilities as a minor were removed he became a member of the board of directors of said woolen mill in 1899; that said woolen mill was organized and incorporated by W. J. Slayden, S. F. Kirksey, Sr., and S. W. Slayden in 1885, said defendant W. W. Cameron at that time being a small child about seven years of age; that with the exception of about eight months, from January to September, 1907, when defendant W. W. Cameron was temporarily president of said woolen mill corporation, S. F. Kirksey, Sr., was its president from 1898 until it went out of business by institution of bankruptcy proceedings in 1912, and that in 1907 S. F. Kirksey, Jr., became vice president and general manager of said corporation, and that neither of said defendants W. W. Cameron or E. R. Bolton were at any time ever in active control and management of the affairs of said mill, but that same was under control of said S. F. Kirksey, Sr., S. F. Kirksey, Jr., and others as managing officers in active control of the books and business affairs of said corporation, and that these defendants, and what was known as the Cameron interest in said woolen mill, were at all times minority stockholders, the majority of the stock being owned and held by W. J. Slayden, S. W. Slayden, and S. F. Kirksey, Sr., and S. F. Kirksey, Jr., who by their said stock controlled the business management and policies of said woolen mill; that E. R. Bolton married Margaret Cameron in 1902, and became a member of the board of directors of the mill in 1908. Said defendants deny knowledge or notice to them of the existence of any system, method, or policy of those in active control and management of the business affairs of said woolen mill, or of any one connected with said corporation, to issue, and the issuance of, financial statements by said corporation containing false representations as to its assets, or that any such system, method, or policy existed to issue false financial statements, or that any financial statements of said woolen mill were issued that to defendants' knowledge, or to the knowledge of either of them, contained any false representations, or any notice to them, or either of them, that same contained false representations; and deny the issuance by said woolen mill, or those in connection with the management of its affairs, of financial statements containing false representations; and deny that any financial statements of said woolen mill were issued for the purpose or with the intention of defrauding plaintiff bank, or any person or institution; that neither of these defendants W. W. Cameron and E. R. Bolton prepared the financial statements of the mill for December 31, 1909, and 1910, or signed said statements, or prepared any other financial statement of the mill, but that said financial statements, and each and all of the financial statements that may have been issued by the mill, were prepared by the then bookkeepers and officials in active control and management of the business affairs of the mill; and such statements that may have come to the knowledge of these defendants, or either of them, were believed to be true, and not known to these defendants, or either of them, to contain any misrepresentation or false statement, and that these defendants at all times believed said woolen mill was an entirely solvent institution and amply able to meet all its indebtedness and its stock of value; that neither of these defendants W. W. Cameron and E. R. Bolton made any financial statement or other representations to the plaintiff First National Bank of Galveston, regarding the financial condition of the Slayden-Kirksey Woolen Mill, nor authorized said S. F. Kirksey, Jr., or any one else, to make any statement, or statements, to said bank in connection with the application for a loan or otherwise, and that neither of these defendants knew that said S. F. Kirksey, Jr., or any one else acting for said woolen mill, had made any financial statement, or statements, or any representations to said bank, or applied to said bank for a loan, or line of credit, until long subsequent to the making by plaintiff of a loan or loans, and extending a line of credit to said woolen mill, and not until October, 1911; that W. W. Cameron is president of Wm. Cameron & Co., Incorporated, having been elected to such position in 1899, and E. R. Bolton is secretary of said corporation, being elected to such position in 1904, and that the time and personal attention of both of these defendants has been devoted to the conducting of the business of Wm. Cameron & Co., a corporation, engaged in the lumber business, since their connection with same, and W. W. Cameron since its organization in 1899; that neither of said defendants W. W. Cameron and E. R. Bolton conspired with either of the defendants to issue, or cause to be issued, or sanctioned the issuance of, any financial statement of the woolen mill containing false statements, knowing that same contained false statements, or willfully, wantonly, and recklessly issued, or permitted to be issued, false financial statements of said woolen mill by the bookkeepers and officials of said woolen mill in active control and management of its business affairs, and are therefore not liable to plaintiff, a creditor of said woolen mill, in damages as prayed.

The answer of defendant, W. J. Slayden, after denying generally and specifically all

of the material allegations of the petition seeking to hold him liable herein, avers that he had, since the year 1885, been a non-resident of the state of Texas, and that he had not been an active director at any time after that date, and that after the annual meeting of stockholders in January, 1902, he had not been to Waco, and had not attended a directors' or stockholders' meeting, and that his services as such director were honorary and nominal only, and that it was well understood by all the officers, directors, and stockholders of said corporation, and by all persons doing business with said corporation, that his connection therewith, as such director, was purely honorary and nominal, and that he was not engaged in the active management of the mill, or in the control or direction of any of its affairs, and that he was not acquainted with the details of the business, and not in a position to know or become acquainted with the same, and that any and all persons having any business connections with said mill corporation, and especially the plaintiff, knew or ought to have known, such facts. He expressly denied that he participated in any way in the preparation of any financial statement of the mill, or that he ever caused the same, or any of the same, to be prepared, and he further denied that he knew, or had opportunity of knowing, the details and particulars of the several accounts, as shown on the books from which said statement purported to have been taken, and he denied that any statement after the year 1902 was ever approved by him, and that he had ever directed any such statement to be used as a basis for the extension of credit by lenders or banks to said mill, and he further denied that he ever presented, or caused such statement to be presented, to any mercantile agency. He further denied any knowledge of the insolvency of said mill prior to December, 1911, and he denied any knowledge of any representations being made by those in active management and control of the mill to persons to whom they applied for loans, or from whom they secured loans, or money to be used in conducting the business of the mill, and he denied any knowledge of the details of the procuring of such loans, the parties from whom they were procured, or the amounts or maturities of the same, and he denied that prior to said last-named date he had any knowledge that plaintiff held any of the paper of said mill, or that said mill was in any way obligated to said bank. He further set out that the plaintiff had presented its claim for the monies owed to it by the mill corporation at the time of the bankruptcy of such mill, to the bankrupt court, and had received dividends thereon, and expressly denied that such dividends so received were all that might reasonably be expected to be received thereon, and alleged, on the contrary, that certain suits were pending by the trustee in favor of the bankrupt estate of said mill, and that plaintiff was entitled to participate on its said proved claim in the distribution of any and all proceeds recovered by the trustee in such suits. He further pleaded that he had been charged on the books of· the mill with the balance due by him upon all stock issued to him at the time of the respective increases of stock, as alleged by plaintiff, and that he had paid off and satisfied all said charges, and that the stock held by him was therefore paid in full. He further pleaded that he considered said corporation entirely solvent, and his stock therein valuable and worth dollar for dollar, and that during most or all of the time, even in recent years, he had used said corporation as a depository for his private funds, instead of depositing same in a bank. He further alleged that plaintiff bank knew, or could have discovered with the slightest diligence, that he was not engaged in the active management of said mill corporation, nor in participation in its management, or affairs, and had not been for many years, and that his connection therewith was purely nominal, and that if said bank in any way relied upon his personality in said transaction, which was not admitted, such reliance was through no fault of his, but the same resulted solely from negligence, unwarranted assumption, and lack of inquiry of said bank and its managing officers and agents.

The cause was submitted to a jury in the court below upon special issues, and upon the verdict returned judgment was rendered in favor of plaintiff against all the defendants jointly and severally, except the defendant Padgitt, for the sum of $29,022.57. This appeal is prosecuted only by the defendants W. W. Cameron, E. R. Bolton, and W. J. Slayden, none of the other defendants having appealed. Slayden has filed a separate brief from the other appellants, who join in the same brief but present separate assignments.

[1] The evidence shows that the Slayden-Kirksey Woolen Mill, which was originally a partnership, was incorporated in 1885. Appellant W. J. Slayden was one of its founders and was a stockholder and director in the corporation from its organization until its failure in the fall of 1911. Appellant W. W. Cameron inherited stock in said corporation from his father, who died in 1899, and shortly thereafter said appellant became a director in the corporation and continued as such until its failure. From January to October, 1907, he was president of the company, and in December, 1907, after he had resigned from the office of president, he was elected treasurer and retained that position until the failure of the company. Appellant Bolton was elected director in January, 1908, and in February of that year was made assistant treasurer and held both

positions until the company failed in 1911.

In the yearly conduct of its business, which was the manufacture and sale of woolen goods and also the buying and selling of clothing, the company required large sums of money and at times borrowed as much as several hundred thousand dollars. Its loans were sometimes obtained from banks and sometimes by employing commercial brokers to sell its notes. For a number of years prior to and including the year 1910 the company had issued yearly a financial statement showing its assets and liabilities. These statements were made out by employés of the company on December 31st of each year and were furnished to Dun's and Bradstreet's agencies and to banks and commercial brokers patronized by the company.

On November 22, 1910, S. F. Kirksey, Jr., vice president of the woolen mill, wrote plaintiff bank, calling plaintiff's attention to the fact that it had previously purchased notes of the woolen mill, and asking plaintiff to advise him whether it was in the market at that time for "any outside paper." This letter, which was written upon letter heads of the woolen mill company, upon which appears the names of the officers and directors of the company, all of the defendants being named as directors, and which was signed "Slayden-Kirksey Woolen Mill, per S. F. Kirksey, Jr., V. P.," closes with the statement:

"We inclose you herewith a financial statement showing the condition of the Slayden-Kirksey Woolen Mill at the close of business December 31, 1909, for your information."

The plaintiff bank, by its cashier, Mr. F. W. Catterall, replied to this letter on November 23d, stating that it was not buying commercial paper at that time, but would be glad to enter into business relations with the woolen mill, and that it might be advantageous for the mill to open an account with plaintiff bank and by so doing secure a line of credit at reasonable rate that the mill could rely on when needed. As a result of this correspondence Mr. Kirksey went to Galveston and made arrangements with plaintiff for a line of credit of $40,000. In extending this credit plaintiff bank relied upon the financial condition of the woolen mill being truthfully shown in the financial statement sent it by Kirksey in the letter before mentioned, and which was discussed by Mr. Catterall and Kirksey before the agreement to extend the credit was made. Plaintiff also took into consideration, in agreeing to extend said credit, the statements of Kirksey to the effect that the woolen mills were in really a better financial condition than was shown by the statement and was also influenced by the business standing and reputation of the defendant directors. The assets of the woolen mill shown in this statement were as follows:

### Assets.

| | |
|---|---|
| Wool and manufacturing goods ... | $211,264 25 |
| Accounts and bills receivable ..... | 255,975 54 |
| Buildings, real estate, and machinery ............. | 289,583 27 |
| Stock and bonds................. | 60 00 |
| Furniture and fixtures .......... | 1,712 11 |
| Cash on hand .................. | 10,755 24 |
| | $768,350 41 |

At the top of this statement and of all yearly statements issued by the company the names of the board of directors appear. Valuation of the goods shown in said statement was made without allowance for having been shelfworn and out of style and largely exceeded their actual value. The amount of accounts and bills receivable shown in the statement included accounts against deceased persons, persons who had become bankrupt, and persons who had ceased to do business. Many of the accounts were barred by limitation, and some had been put into judgments and the judgments had become dormant. More than $100,000 of accounts shown on said statement as assets were worthless. The valuation placed upon the mill and machinery was made without any allowance for depreciation, and greatly exceeded the actual value of said assets. If plaintiff bank had known the truth as to the value of the assets shown in said statement, it would not have extended the credit.

The evidence further shows that the financial statements issued by the woolen mill as far back at least as 1906, and one issued in December, 1910, contained similar false valuation of the assets of the company. These financial statements were prepared from the books of the company by employés of the company, but were submitted to and approved by the board of directors. The false valuation in such statements was due to a wrong method of bookkeeping, which had been followed habitually by the company for many years, the vice in the bookkeeping being that, instead of charging bad accounts which had proved uncollectable to profit and loss, such accounts were, from year to year, placed upon what was called the "suspended ledger account," and were included in the financial statements as assets of the company. The system followed in valuing the goods and the building and machinery made no allowance for depreciation caused by age and use. This method of keeping books and preparing financial statements is contrary to commercial custom and usage. With such a system of bookkeeping it necessarily followed that a financial statement copied from the books would be false and misleading. Appellants Cameron and Slayden both knew accounts upon the "suspended ledger" were included in the financial statements issued by the company from time to time; and, if they did not know that a large portion of such accounts were worthless, they had been so told. Cameron had an audit of the books made in

1907 which showed that $110,000 of these accounts were worthless, and he endeavored to discontinue the "suspended ledger account," and succeeded in having $30,000 of said accounts charged off, but the next year $22,000 of these worthless accounts were put back on the ledger by S. F. Kirksey at the instance of W. J. and S. W. Slayden, but without any formal action of the board of directors. All of the appellants knew that a yearly financial statement was issued by the company and that one, if not the main, purpose of preparing and issuing these financial statements was to enable the company to readily dispose of its notes and to obtain loans. The yearly financial statements issued by the company were presented to and passed upon by the board of directors at the yearly meetings. Appellant Slayden was not present at any meeting of the directors after 1902, when he moved to New York, but was present at meetings of the stockholders and was frequently consulted in regard to the company's business and loans by the officers and other directors in person and by letter. The appellants Cameron and Bolton were present at the directors' meetings when the financial statement of December 31, 1909, was presented for approval. S. F. Kirksey, Jr., who was authorized by a resolution of the board of directors of the company "to make and execute notes of the mill" and given "full power and authority to do and perform all and every act or thing that may be considered necessary to be done in and about the premises," having established the $40,000 line of credit with plaintiff, as portions of said sum was needed in the business of the company, executed notes of the company therefor. Some of the notes were paid as they matured, and the amounts thereof subsequently reborrowed. In this way, the entire credit was consumed so that at the time of its failure the mill owed the bank the full sum of $40,000 evidenced by notes.

In the summer of 1911 a note of the mill, due in St. Louis, was protested, and the mill was found to be in financial difficulty. This was met temporarily, but in the fall of that year embarrassments were such that creditors' meetings were called and held, discussions were had as to methods of satisfying creditors and continuing the business, which came to naught, and the mill went into bankruptcy. At that time the indebtedness, according to Mr. Cameron's own statement, amounted to $372,000. All the assets, including bills and accounts receivable after some collections had been made, were sold by the trustee and bought by a committee acting for the creditors, bringing $155,000. This, with the collection, amounted to about $170,000. Forty per cent. of the indebtedness was thus paid, which left the mill company owing the bank a balance, which, with interest, amounted at the time of the trial to $29,022.-59. After the purchase of the assets by the creditors, they placed the goods for sale with Sanger Bros., experienced merchants having exceptional facilities for disposing of them. They placed some of the accounts, etc., with R. G. Dun & Co. for collection. They still hold the machinery, mill, and real estate, and after every effort to sell it advantageously, the best offer they have been able to get was a request for 60 days' option at $75,-000 on a credit of five years. They realized for the wool and manufactured goods of every description $55,000. They collected on accounts and bills receivable $18,694, realizing $16,927 after paying cost of collection. Stating the mill machinery at $75,000, the total realized by the creditors' committee would be $146,000, $8,000 less than their bid at bankrupt sale. It was shown that several suits by the trustee to recover amounts claimed by the company were pending, and if the trustee should be successful in such suits and the judgments therein collected, a further dividend would be obtained by the creditors of the company.

The questions submitted to the jury and answers returned in the verdict were as follows:

"(1) Did the statement of December 31, 1909, contain material misrepresentations of the assets of the mill as charged by plaintiff? Yes.

"(2) Name the defendants, if any, who had notice of the material misrepresentations, if any, in the statement. S. F. Kirksey, Sr., S. F. Kirksey, Jr., W. J. Slayden, S. W. Slayden, W. W. Cameron.

"(3) Did the defendants, or any of them, in authorizing said statement and its use fail to exercise such care as men of ordinary prudence would have done under the circumstances? Answer, Yes or No. Yes.

"(3½) If you have answered 'Yes' to the preceding question, then name the defendants who failed to exercise ordinary care. S. F. Kirksey, Sr., S. F. Kirksey, Jr., W. J. Slayden, S. W. Slayden, W. W. Cameron, E. R. Bolton.

"(4) Did the plaintiff rely upon such misrepresentations, if any? Answer Yes or No. Yes.

"(4½) Was the plaintiff misled by such misrepresentations, if any? Answer Yes or No. Yes.

"(5) Would a person of ordinary prudence have been so misled? Answer Yes or No. Yes.

"(6) If so misled to its injury, write out the amount of the damages, being $29,022.57. $29,-022.57. A. E. Burgess, Foreman."

We think each and all of these findings of the jury are sustained by the evidence.

[2] The first assignment of error presented by appellant Cameron complains of the refusal of the court to instruct a verdict in his favor upon the following grounds:

"(a) Because plaintiff failed to make out a case against said defendant, and the evidence is wholly insufficient to show and sustain the cause of action of plaintiff as set out in its petition as against said defendant, and on which to warrant a recovery against said defendant.

"(b) Because there is no legal evidence establishing or tending to show that said defendant, W. W. Cameron, had any knowledge or notice that any method or system was being pursued by the officials of said woolen mill, or those in charge of the active management of the finances and business affairs of said corporation to issue financial statements containing material misrepresentations as to value of certain assets of said woolen mill, as in plaintiff's petition alleg-

ed, and the use of such statements for obtaining credit.

"(c) Because there is no legal evidence establishing or tending to show the existence of any method or system pursued by defendants, or either of them, that the officials of said woolen mill, or those engaged in the active management of the business affairs of said corporation, to issue false financial statements as a basis for credit, as in plaintiff's petition alleged.

"(d) Because there is no evidence to show that the defendant W. W. Cameron had knowledge of the issuance of the financial statement in question of December 31, 1909, and approved and sanctioned the use of same for the obtaining of a loan or credit from the First National Bank of Galveston for said woolen mill, or from any other institution or any person.

"(e) Because the evidence fails to show that the defendant W. W. Cameron authorized, approved, or sanctioned the use of a false statement to obtain credit from plaintiff, or any other person, for said woolen mill corporation.

"(f) Because, even if it should appear from the evidence, which is not admitted, but denied, that said W. W. Cameron did have notice that financial statements were being used by said mill corporation, or those in control of the active management of same, as a basis for credit, which contained material misrepresentations as to the assets of said mill, there is no evidence to show that he authorized, sanctioned or approved such use of said statements, or that he could, by the use of ordinary care, have prevented such use.

"(g) Because the evidence fails to show what damage, if any, plaintiff has sustained on account of the use of said statement of December 31, 1909, or the statement on which plaintiff relied as a basis for the credit, alleged as containing misrepresentations as to the value of the assets of said mill.

"(h) Because there is no evidence showing the facts necessary to establish proper measure of damages on which to base recovery by plaintiff herein."

Appellant Bolton, by his first assignment, makes a similar complaint on the same grounds.

The evidence in support of the findings that the statement of December 31, 1909, which was presented to appellee for the purpose of inducing it to grant the line of credit to the woolen mill, contained material misrepresentations of the assets of the mill and that appellee relied upon such misrepresentations and was misled thereby to its damage as alleged in its petition, and that appellee was not negligent in relying upon the truth of said misrepresentations and being misled thereby, and if not uncontradicted, is so overwhelming that no serious question can be raised as to the correctness of such findings.

[3] We also think the evidence is sufficient to charge appellants Cameron and Slayden with notice of the fact that the statement did contain false representations of the assets of the company and that such statement was prepared and issued for the purpose of obtaining credit for the mill. Both of said appellants had been for many years directors of the mill company and knew that yearly financial statements were issued by the mill, with the approval of the board of directors, and were used for the purpose of obtaining credit. They also knew the method by which the accounts of the mill were kept, and, that it had been the uniform custom in preparing financial statements to include in such statements as assets accounts which had proven uncollectable and which by general commercial custom and usage should not be included in a financial statement as assets. If Cameron did not know that the statement of December 31, 1909, had been presented to and at least tacitly sanctioned by the board of directors, he saw and read the statement, and did nothing to prevent its use for the purpose for which it was issued. This latter statement in regard to Cameron is equally true in regard to the appellant Bolton. Appellant Slayden not only knew that the company, in making up its financial statements, included therein the accounts shown in the "suspended ledger" as assets of the company, but encouraged and assisted such method of preparing the financial statements by opposing the striking from the assets of the company the "suspended ledger" accounts.

[4] If there can be doubt as to the sufficiency of the evidence to charge all of the appellants with notice of the false representations contained in the statement presented to appellee, the evidence sustains the third finding of the jury that all of them failed to exercise such care as men of ordinary care would have done under the circumstances. The evidence, as before stated, shows that the books of the company were erroneously kept, and, in regard to the "suspended ledger" accounts entries on the books showed that many of the accounts were "outlawed," many against bankrupts and persons out of business, and many against deceased persons, and that all of said accounts were long past due. These books were open at all times for inspection by the directors. The financial statements, copies of which were furnished to the directors and which were discussed at directors' meetings held in January of each year, were made from the books of the company, and the directors knew they were so made. From these facts it appears to us that exercise of ordinary care on the part of appellants would have conclusively shown them that the financial statement falsely represented the assets of the company. The evidence that all the appellants knew that financial statements were regularly issued by the company and were used for the purpose of obtaining credit is undisputed.

[5, 6] The fact that preparation of the financial statement was intrusted by the directors to subordinate employés of the company under the control of the directors cannot relieve them of responsibility for the misrepresentations contained in such statements, nor is their liability in any way affected by the fact that they did not expressly authorize the presentation of such statement to appellee for the purpose of obtaining credit.

The statute provides that "the directors shall have general management of the affairs of the corporation." R. S. art. 1159. The borrowing of money in conducting the business of the company and the means and methods by which the necessary loans could be obtained were certainly affairs of the corporation committed by the statute to the management of the directors, and the evidence in this case shows that the appellants so considered them as they yearly discussed and passed upon the financial statements issued for the purpose of obtaining credit. It goes without saying that the issuance of such statements under the names of the directors of the company would not be regarded by those to whom they were habitually sent as statements sanctioned and approved only by the subordinate employés who prepared them, and appellants must have known that it could not be so regarded.

[7, 8] It is true that the directors were agents of the corporation, but an agent is as much responsible as his principal for fraud perpetrated on another in which he participated. We think it clear, upon both principle and authority, that having accepted the position and exercised the duties of directors, and having sanctioned the long-continued method of borrowing money for the company on the faith of yearly financial statements, appellants must be held responsible for the truth of the statements so sanctioned by them. Whatever may be the rule in other jurisdictions, we think it is settled by the decisions of our Supreme Court that directors of a corporation are liable for false statements of the solvency of the corporation negligently made or sanctioned by them for the purpose of inducing others to extend credit to the corporation. Seale v. Baker, 70 Tex. 283, 7 S. W. 742, 8 Am. St. Rep. 592; Giddings v. Baker, 80 Tex. 308, 16 S. W. 33; Baker v. Ashe, 80 Tex. 359, 16 S. W. 36; Kinkler v. Junica, 84 Tex. 116, 19 S. W. 359. In the case first cited the court says:

"The directors of a banking corporation are personally liable at the suit of an individual depositor for damages sustained by reason of the insolvency of the corporation, when the depositor is induced to place money in the hands of the corporation solely by representations of solvency made to the general public by the directors, who ought to have known, and by the use of ordinary care such as it was their duty to have exercised might have known, that such representations were false."

[9] The general rule that mere negligent mismanagement of the business of a corporation by which the corporation and its creditors suffer loss will not render the directors liable to creditors cannot be extended to relieve directors of liability from representations sanctioned by them for the purpose of inducing, and by which another is induced, to loan money to the corporation. It seems to us that the distinction between the two cases is obvious.

[10] The first assignment presented in the brief of the appellant Slayden is as follows:

"The court erred in failing and refusing to give in charge to the jury this defendant's special requested charge, which reads as follows, to wit: 'If you believe from the evidence that the stockholders of the Slayden-Kirksey Woolen Mill knew at the time of the election of W. J. Slayden as a director thereof from year to year from 1902 to 1911, inclusive, that said W. J. Slayden did not reside at Waco, but at a point, or points, remote from Waco, and that said W. J. Slayden was so situated that he could not personally discharge the duties of a director, and that he would not do so, and you further believe from the evidence that said W. J. Slayden did not attend directors' or stockholders' meetings after the year 1902, and that he did not participate, or profess to participate, in the management of said mill by the active directors thereof; and if you further believe that he did not participate in the preparation of the financial statement of said mill for the year 1909, and that he did not personally authorize the presentation of the same, as a basis for credit, and if you further find that he did not know of the presentation of the same to this plaintiff by S. F. Kirksey, Jr., or authorize or participate in the same, and if you further believe from the evidence that the plaintiff, through its managing officers, had notice that said Slayden did not live at Waco, and that the same or any other facts known to them, if any, was sufficient to put them, as reasonably prudent men, on inquiry as to the residence of said Slayden, and his nonparticipation in the active management of said mill—then you will find for the defendant W. J. Slayden on all the issues presented to you for determination by the court in the charge submitted to you herein.' "

[11] From what we have before said it follows that, in our opinion, it is wholly immaterial where appellant Slayden resided. He accepted and continued to exercise the duties and responsibilities of director of the corporation, and knowingly allowed himself to be held out to the public, including appellee, as one of the governing officers of the corporation, and the mere fact that appellee knew that he resided in New York would not authorize a finding that it was negligent in relying upon the assumption that he sanctioned the issuance of the financial statement made under his name and with the apparent approval of all of the directors. It is apparent, as contended by appellee, that the jury might have found every fact stated in the charge to be true, and yet said appellant would be liable upon the facts found by the jury, as there would have been no inconsistency in the two findings, and the refusal of the charge could not therefore be held prejudicial to the appellant.

[12, 13] The contention that the court should have instructed a verdict for the appellants because the evidence fails to show what damage was suffered by the appellee cannot be sustained. The appellants did not except, as required by article 1971, to the charge of the court instructing the jury in event they found for the plaintiff to assess the damages in the sum named in the charge, nor did they ask for the submission of any issue as to the amount of damages, and for these reasons they cannot be heard to complain of the charge given by the court.

Moore v. Pierson, 100 Tex. 113, 94 S. W. 1132.

[14, 15] But in no event should the peremptory instruction have been given upon the ground that the proper measure of damages had not been shown. In fraud cases in which by misrepresentation one person has been induced to purchase property from another the general rule for the measure of damage is the difference between the value of the property and the amount paid therefor, and in the case of Baker v. Ashe, 80 Tex. 359, 16 S. W. 36, our Supreme Court applied this rule in a suit brought by a defrauded creditor against the directors of a bankrupt bank to recover damages for the fraud. The facts in that case, however, were entirely different from those in the instant case. In the case cited, the evidence shows that large bodies of unsold land were in the possession of the receiver of value sufficient to pay a dividend of 26 per cent. in addition to the dividend already received by the creditor, and the court held that in fixing the amount which the creditor was entitled to recover against the directors the amount of the further dividend that would be received from the receiver should be considered. In the present case all the visible definite assets of the corporation had been sold, and further dividends would be wholly dependent upon the contingent result of litigation and in event the litigation should terminate in favor of the trustee upon the collection of the judgment obtained, and the value of such assets are incapable of definite ascertainment. It would utterly fail to give appellee a just and fair compensation for the loss sustained by it by reason of the wrong of appellants to require it to accept in part satisfaction of such loss the uncertain and speculative value of the claims asserted by the trustee in suits pending, brought for the bankrupt company, or to require appellee to await the final result of such suits before it can call upon appellants to reimburse it for its loss. We are unwilling to establish such rule as a proper measure of damage in cases of this kind.

We have carefully considered all of the numerous assignments of error presented in appellants' briefs, and what we have said, in our opinion, disposes of all of the material questions presented. It would greatly add to the length of this opinion, and would serve no useful purpose to set out and discuss the assignments in detail. If our conclusions before expressed are sound, no harmful error was committed on the trial, and all of the assignments must be overruled.

In reaching the conclusion that the judgment of the court below should be affirmed upon the grounds stated, we do not mean to hold that either of the appellants intentionally defrauded the appellee. Each of them, no doubt, honestly believed that the Woolen Mill Company was solvent, and no one would lose by extending it credit, but this honest belief cannot shield them from liability for sanctioning the issuance of financial statements issued for the purpose of obtaining credit for the company, and which contained misrepresentations whereby appellee was induced to extend the credit and suffer the loss claimed by it. That such result was not intended in the issuance of the financial statements is no defense to appellee's suit. We are of opinion that the judgment should be affirmed; and it has been so ordered.

Affirmed.