**David C. MEYERS, et al.,
Plaintiffs-Appellees,**

v.

**Shearn MOODY, Jr.,
Defendant-Appellant.**

**Bernard HAINES, et al.,
Plaintiffs-Appellees,**

v.

**Shearn MOODY, Jr.,
Defendant-Appellant.**

**Tharpe FORRESTER, Receiver-Appellee,**

v.

**Shearn MOODY, Jr.,
Defendant-Appellant.**

No. 80–1145.

United States Court of Appeals,
Fifth Circuit.

Dec. 23, 1982.

Rehearing and Rehearing En Banc
Denied March 1, 1983.

---

**10.** See note 4, *supra.*

**11.** See note 3, *supra.*

William E. Junell, Jr., Joe Reynolds, Houston, Tex., John M. Harmon, Austin, Tex., for defendant-appellant.

Will E. Wright, Larry G. Patton, Houston, Tex., Robert L. Blumenthal, Dallas, Tex., James W. Webb, Montgomery, Ala., for Tharpe Forrester.

Before THORNBERRY, REAVLEY and JOHNSON, Circuit Judges.

REAVLEY, Circuit Judge:

The receiver ("Receiver") of Empire Life Insurance Company of America ("Empire") brought this action against Empire's president, board chairman and majority shareholder, Shearn Moody, Jr. ("Moody"), alleging that Moody violated both federal securities law and his fiduciary duties in the management of Empire's affairs. The jury verdict and district court judgment, 475 F.Supp. 232 (D.C.Ala.1973), went against Moody on both securities and common law grounds. Moody appeals and we affirm.

In the summer of 1963 Empire was a fledgling company licensed in a single state, with no business, one employee, $256,000 of capital and surplus and no other assets. By the end of 1968 Empire was licensed in sixteen states, with approximately $455,-000,000 of business in force, 500 full-time agents, $20,000,000 in reported surplus and $60,000,000 in reported assets. This phenomenal growth was made possible by Moody's assignment to Empire of 40 percent of his life estate in a trust established by his grandmother.[1] The life interest was admitted as an asset of Empire at a value of $5,813,440 in 1964, $14,403,200 in 1965, and $4,250,000 in 1972. When the life interest's assigned value increased, Empire prospered; when its value declined, Empire collapsed.

■ A critical factual issue has been the designation of responsibility for the $14,-403,200 value placed on the life interest. Moody claimed that responsibility rested with national accounting firms, an independent actuary and the Alabama Superintendent of Insurance. The jury found that the value increase was done by Moody as part of a scheme to defraud. As will be seen, that finding is supported by the evidence. Other facts and legal issues, however, must be faced to dispose of the appeal.

## I. Factual Background: The Rise and Fall of Empire[2]

In 1943 the Libbie Shearn Moody Trust was created for the benefit of certain heirs, including Shearn Moody, Jr. The corpus of the trust consisted chiefly of 9,949,585 shares of stock in American National Insurance Company ("ANICO"), and ANICO dividends produced approximately 90% of the trust's income. Moody inherited a one-eighth life interest in this trust.

On June 27, 1963, Moody incorporated Empire Life Insurance Company in the State of Alabama. Moody, the company's sole shareholder, contributed $256,061 to Empire. Such meager capital could not support Moody's ambitious plan—to amass quickly as many assets as possible by acquiring other life insurance companies, which are required by law to have substantial assets in reserve to pay policyholder claims. To embark upon an acquisition program Empire needed a substantial surplus.

Empire acquired that surplus in July 1963 when Moody assigned to it 40 percent of his interest in the Libbie Shearn Moody Trust in consideration for a $200,000 surplus debenture. Moody and Dale R. Major, Moody's lawyer and chief assistant, intended and believed that the instrument assigning the life interest precluded its further transfer; but Moody never communicated this thought to any insurance commissioner, Empire director, or Empire shareholder, despite (or because of) the fact that an asset which cannot be transferred cannot be admitted as an asset of an insurance company.

Before the life interest could be used to support Empire's expansion, it was necessary that the Alabama Superintendent of Insurance "admit" the interest as an asset of Empire at an approved value. To determine the interest's value, Moody employed the actuarial firm of Lloyd K. Friedman & Associates and the national accounting firm of Ernst & Ernst. In the spring of 1964 Lloyd Friedman furnished Henry Hogan, a partner in Ernst & Ernst, with a suggested method of calculating the life interest's value. This method took into consideration an actuarial factor (Moody's life expectancy) and three economic factors (current trust income, future increases in trust income, and future interest rates), the objective being to arrive at the present value of predicted income from the trust. Hogan accepted Friedman's valuation method, as well as his assessment of Moody's life expectancy and current trust income. Hogan himself selected what he considered the most reasonable growth rate and discount rate. In de-

---

1. This 40 percent of Moody's life estate in his grandmother's trust will hereafter be referred to as "the life interest."

2. The following synopsis of facts is stated most favorably to the jury verdict, and hence the plaintiff. See Quinn v. Southwest Wood Products, Inc., 597 F.2d 1018, 1019 (5th Cir.1979).

termining the applicable growth rate, Hogan noted that ANICO's cash dividends had increased at an average annual rate ·of nearly 40 percent over the previous twelve years. Hogan expressly took this increase into account in concluding that it would be most reasonable to assume a 5 percent growth rate in trust income. In determining the applicable discount rate to apply to future income, Hogan considered but rejected a 4 percent rate in favor of a 5 percent rate.[3] In a letter dated September 1, 1964, Hogan informed Moody that, based on the valuation method and assumptions set forth above, the life interest owned by Empire should be valued at $5,813,440.

At Moody's request, Lloyd M. Jard, a partner in the accounting firm of Peat, Marwick, Mitchell & Co., ("Peat Marwick") transmitted a copy of Hogan's letter to Walter S. Houseal, Superintendent of Insurance for the State of Alabama. On October 27, 1964, Superintendent Houseal informed Empire that the Alabama Insurance Department accepted the life interest as an admitted asset of Empire at a value of $5,813,440. Houseal stipulated, however, that acceptance of the life interest at this or any other value would continue only so long as the Department received each year an updated appraisal of the life interest "prepared by Ernst & Ernst or other competent appraiser." Empire listed the life interest as an admitted asset at a value of $5,813,440 in its December 31, 1964 report to shareholders.

The $5,813,440 valuation of the life interest provided Empire with the surplus necessary to consummate a merger with Consolidated American Life Insurance Company ("CALICO"), a publicly held corporation. On December 31, 1964, Empire issued 345,103 shares of Class A common stock for all of CALICO's outstanding common stock. Although Empire acquired minority shareholders as a result of this merger, Moody retained virtually all of the company's Class B voting stock, as well as the ability to elect all but one of its directors.

The CALICO merger so depleted Empire's surplus that the rapid expansion program envisioned by Moody was placed in jeopardy. Thus, within six months of Superintendent Houseal's approval of the life interest at a value of $5,813,440, Moody undertook a series of actions that resulted in an increase in excess of $8,000,000 in the life interest's admitted value.

In a letter dated March 8, 1965, Dale Major, who was by now executive vice-president and secretary of Empire, informed Houseal that ANICO had recently announced a dividend increase of two cents per share. Major continued:

> Our accountants have been apprised of the [dividend increase], and have been instructed to prepare immediately a current evaluation based on this increased dividend. As soon as this appraisal is received it will be forwarded to you.

About the same time, Moody asked Lloyd Friedman to recalculate the value of the life interest based on new economic variables. In a letter dated March 31, 1965, Friedman responded by setting forth in summary fashion alternative valuations of Moody's entire one-eighth life estate as of December 31, 1964. Friedman's calculations assumed current annual income of $400,000, a discount rate of 4%, and alternative growth rates of 5%, 7½% and 10%. An assumed growth rate of 5% yielded a $19,488,000 valuation of Moody's entire life estate; a 7½% assumed growth rate yielded a $36,000,000 valuation; and a 10% assumed growth rate yielded a $73,908,000 valuation. Friedman offered no opinion as to which, if any, of these assumed growth rates were reasonable.

Friedman's response did nothing more than apply arithmetic to the obvious fact that the value of the life interest owned by Empire could be substantially increased if the three critical economic assumptions on which Ernst & Ernst had based its appraisal were altered. Specifically, the life interest's value would rise from $5,813,440 to $14,403,200 if the appraiser assumed (a) current annual income of $400,000 rather than

---

**3.** The higher the discount rate, the lower the present value of the life interest.

$370,000, (b) a growth rate of 7½% rather than 5%, and (c) a discount rate of 4% rather than 5%.

Immediately after receiving Friedman's letter, Moody provided Empire's accountant at Peat Marwick with the new computations. On April 2, 1965, Peat Marwick transmitted to Moody a statement of Empire's assets and liabilities as of December 31, 1964. In an accompanying letter, the accounting firm stipulated that the financial statement was "prepared without audit or verification by us from data you made available, ... [including] a computation by an independent actuary of the company's life interests in the Libbie Shearn Moody Trust." The statement listed the life interest as an admitted asset with a value of $14,403,200. Noting the discrepancy between this valuation and the $5,813,440 valuation appearing in Empire's December 31, 1964 report to shareholders, the firm stressed that it had not inspected any report which might underlie the actuary's computations.

At about this time, Moody and Major met with Superintendent Houseal during a convention of the National Association of Insurance Commissioners in Miami. Moody and Major informed Houseal that they intended to seek a revaluation of the life interest, and that studies had been made which indicated the life interest was worth approximately $14,000,000.

On April 8, 1965, Lloyd Jard of Peat Marwick transmitted to Superintendent Houseal, at Moody's request, a copy of Friedman's letter setting forth alternative valuations of the life interest. Houseal apparently also received a copy of Peat Marwick's unaudited financial statement, as well as another copy of Friedman's letter containing the following addendum: "Two-fifths of the trust valuation at $36,008,-000.00 is equivalent to the $14,403,200.00

appearing in the Peat, Marwick & [sic] Mitchell & Co. financial report dated December 31, 1964."

Major testified that a formal valuation hearing was held in the spring of 1965 before Superintendent Houseal and that Houseal then accepted a $14,403,200 valuation of the life interest.[4] No written record of either this hearing or its findings was introduced.

Immediately following Houseal's approval of the increased valuation of the life interest, Empire embarked upon an aggressive acquisition program. In the last six months of 1965 the company's size more than doubled. In June, Empire made a stock-for-stock acquisition of the Empire Life Insurance Company of America (Little Rock, Arkansas).[5] In November, the company paid cash for a controlling interest in the National Insurance Company of America. These developments were noted in Empire's December 31, 1965 report to shareholders. The annual report also listed the life interest as an admitted asset at a value of $14,403,200 and stated:

> Valuation of the trust was calculated by the national accounting firm of Ernst & Ernst, and actuaries including Mr. Lloyd K. Friedman, F.S.A., consulting actuary of Houston.

Moody now concedes that this statement was inaccurate and that Ernst & Ernst did not review the 1965 revaluation.

Empire's expansion program continued in 1966 with the stock-for-stock acquisition of National Empire Life Insurance Company. Despite this extraordinary growth, no state undertook to review the company's financial affairs until the fall of 1966. At that time insurance examiners for the states of Alabama, Texas and Arkansas reviewed Empire's financial condition as of December 31, 1965. The examiners, apparently nonplussed by the sudden and substantial in-

---

**4.** Evidence was presented at trial that tended to prove that Houseal might have been swayed by considerations of friendship and obligation in approving the increased valuation of the life interest. Major and Houseal were friends; indeed, Major recommended Houseal for the position he accepted after stepping down as Su-

perintendent of Insurance. Moreover, Houseal had visited Moody's Texas ranch on several occasions at Empire's expense.

**5.** At the time of this merger the words "of America" were added to Empire's name.

crease in the value of the life interest between 1964 and 1965, consulted Superintendent Houseal for an opinion. Following a meeting with Houseal in October of 1966, the examiners drafted a report that concluded with this curiously limited certification: "The customary insurance examination procedures ... have been followed in connection with the verification and evaluation of the *liabilities* shown in the financial statement of this report" (emphasis added).

On the surface, 1968 was a banner year for Empire. The company's assets increased over 50 percent in that year alone, and the number of subsidiaries under Empire's effective control or under common control with Empire expanded from nine to thirty-one. Empire acquired control of Universal American Life Insurance Company in January, Capital Security Life Insurance Company in April, Investors Preferred Life Insurance Company in May, Centennial Reserve Life Insurance Company in June, and National Investor's Life Insurance Company (a complex of twenty-eight companies, including twelve life insurance companies) in August. In addition, Empire entered into reinsurance agreements with Reliance Life & Accident Insurance Company of America in January, Republic Investors Life Insurance Company in April, American Trust Life Insurance Company in June, and Investors Preferred Life Insurance Company in December.

Although Empire touted its rapid expansion program as a sign of the company's robust health, the true effect of the program was to render the company perilously close to collapse. The aggregate impact of the acquisitions was to drain Empire of its liquid assets. Cash might be obtained so long as the life interest was admitted as a $14,403,200 asset of the company. A significant devaluation of the life interest, however, would end the ride.

In the following year just such a devaluation was threatened. In December 1968, R.

Frank Ussery had replaced Walter Houseal as Alabama's Superintendent of Insurance. By then, the insurance commissioners of several states in which Empire did business had become sufficiently doubtful of the value assigned the life interest that they commissioned the American Appraisal Company to conduct a formal appraisal. In February 1969, American Appraisal reported that as of September 30, 1968, the life interest had a value for continued use of $8,600,000 and orderly liquidation value of $4,250,000. At about the same time, examiners for the states of Texas, Arkansas and Alabama issued an unofficial report of examination as of December 31, 1968, assigning the life interest a value of zero.[6]

In response to these reports, Superintendent Ussery ordered Empire to cease writing new insurance policies and to engage in no further acquisitions and mergers. In June 1969, Ussery accepted a proposal made by Moody whereby Empire would gradually diminish the life interest's net asset value from $14,403,200 to an eventual value of zero. (Empire did not, however, devalue the life interest as agreed.) At the same time, a panel composed of Ussery and four other state insurance commissioners was formed to attempt to rehabilitate the company. The panel met with little success: Empire sustained net operating losses of $1,734,700 in 1969 and in 1970 was temporarily forced to delay payments of claims due to lack of cash revenues.

In January 1971, John G. Bookout replaced Frank Ussery as Alabama's Superintendent of Insurance. Upon learning that no official report of Empire's financial condition had been issued in five years, Bookout ordered that a pending examination be promptly completed. In December 1971, examiners for the states of Alabama, South Dakota and Texas submitted their report of Empire's affairs as of December 31, 1970. The examiners assigned the life interest a value of $4,250,000, in accordance with the fair market valuation by American Apprais-

---

**6.** To quell doubts about the $14,403,200 valuation, Moody hired Richard P. Johnson, an economics professor at Southern Methodist University, to undertake a valuation of the life interest. In November 1968, Johnson reported that the life interest's value as of December 31, 1968 would be no lower than $16,000,000, and that a reasonable valuation was $23,000,000.

al, and found that Empire was statutorily insolvent in excess of $6,000,000 and impaired in excess of $10,000,000.

In April 1972, after reviewing the results of the examination, Superintendent Bookout instituted a receivership proceeding in Alabama court against Empire. Two months later, after a three-week hearing largely devoted to the proper valuation of the life interest, the trial court placed Empire into receivership. The court appointed Superintendent Bookout as receiver and authorized him to solicit offers from other insurance companies for the reinsurance of Empire. At about the same time, the states of Texas, Arkansas and Montana also placed Empire into receivership.

In January 1974, the Alabama receiver sought an order of liquidation of Empire and approval of a bulk reinsurance agreement presented by Protective Life Insurance Company ("Protective"). After another extensive hearing, the receivership court found that Empire was statutorily insolvent in excess of $6,000,000 and impaired in excess of $10,000,000, and that the company's financial condition was "rapidly deteriorating." On June 14, 1974, the court entered an order granting the receiver's petition to liquidate and reinsure the business of Empire into Protective.

In June 1974, Receiver filed a complaint against Moody in United States District Court for the Northern District of Texas[7] alleging that in his management of Empire Moody had violated his fiduciary duties of care and loyalty as well as § 10(b) of the Securities Exchange Act of 1934. The case was tried before a jury in December 1976. In response to special interrogatories, the jury found that Moody had violated both his common law duties to Empire and the federal securities laws. On May 29, 1979, the trial court entered judgment against Moody for actual damages of $5,319,000 and punitive damages of $1,000,000, together with accrued interest. *Meyers v. Moody*, 475

F.Supp. 232 (N.D.Tex.1979). This is an appeal from that judgment.

## II. *The Legal Issues*

### A. *Preliminary Matters*

#### 1. *Standing*

Moody first complains that plaintiff Receiver, appointed under the laws of Alabama, lacked standing to bring suit in a court outside the state of his appointment.

■ The capacity of a receiver to sue in federal court is governed by the law of the forum state. Fed.R.Civ.P. 17(b); Wright & Miller, Federal Practice and Procedure § 1567 (1971). The controlling case in Texas is *Carpenter v. Pink,* 133 Tex. 82, 124 S.W.2d 981 (1939). In that case a New York court placed an insolvent New York corporation in the hands of the New York Insurance Commissioner. At the Commissioner's request a Texas ancillary receiver was appointed to preserve the company's assets in Texas. In a subsequent suit brought in Texas court, the Texas receiver disputed the New York Commissioner's authority under Texas law to prosecute an appeal. The Supreme Court of Texas held that the Commissioner was entitled to prosecute the appeal because he was lawfully a party to the suit in the court below. The court stated:

> We are aware of the general rule that an administrator appointed in one state cannot sue in another, and an ordinary equity receiver appointed by a State court has no extraterritorial powers, but such rule cannot be applied here.... [T]he New York receiver ... did not derive his powers, authority, and title from the decrees of the appointive court, but from the laws of the state which created or chartered this corporation .... [S]ince the State of New York created this corporation, it had the lawful right to say, by statute, who [the corporation's] agents should be ..., both while this corporation was a solvent and going concern, and after it

---

7. On March 21 and May 5, 1972, Empire shareholders had filed derivative suits against Moody. These suits were subsequently consolidated. Receiver joined in the consolidated de-

rivative action as plaintiff, and the shareholders' derivative action was abated and ultimately dismissed, leaving only Receiver's derivative action.

had been declared insolvent.... For us to refuse to recognize the New York Insurance Commissioner as a party to this suit under the facts of this record would be to deny full faith and credit to the statutes and judicial decrees of the State of New York.

*Id.* 124 S.W.2d at 987 (citations omitted).

█ Since Empire Life Insurance Company was created by the laws of Alabama, Alabama had the right to designate its agent in insolvency. The receiver in this case, like the receiver in *Carpenter,* derived his authority not from the decrees of the appointive court but from the laws of the appointive state. Alabama Code § 27–32–15 provides in pertinent part:

As a domiciliary receiver, the commissioner shall be vested by operation of law with the title to all of the property, contracts and rights of action ... wherever located, as of the date of entry of the order directing him to rehabilitate or liquidate a domestic insurer ....

The Alabama receiver accordingly had standing to bring suit in United States District Court for the Northern District of Texas.

█ Moody also argues that Receiver did not have standing to sue on behalf of Empire's shareholders, policyholders or creditors. The law in Texas is to the contrary. In *Cotten v. Republic National Bank of Dallas,* 395 S.W.2d 930 (Tex.Civ.App.—Dallas 1965, writ ref'd n.r.e.), the court stated:

Certainly a receiver for an insolvent insurance corporation ... has a right to maintain a suit which is necessary to preserve the corporation's assets and to recover assets of which the corporation has been wrongfully deprived through fraud. In such a suit the receiver may be said to sue as the representative of the corporation and its creditors, stockholders and policyholders....

*Id.* at 941. Moody's challenges to plaintiff's standing are without merit.

### 2. Statute of Limitations

The events which form the basis of Receiver's state and federal claims occurred more than three years before this suit was commenced. The increased valuation of the life interest occurred in 1965; the acquisition program which that valuation made possible was concluded in December 1968; and the present action was brought in March 1972. Moody argues that Receiver's suit is accordingly barred by applicable statutes of limitations.[8]

█ State law determines when a state law cause of action accrues, *see Walko Corp. v. Burger Chef Systems, Inc.,* 554 F.2d 1165, 1171 (D.C.Cir.1977). Under state law, a cause of action based on fraud accrues only when the fraud is discovered or by the exercise of reasonable diligence should have been discovered. *Gaddis v. Smith,* 417 S.W.2d 577 (Tex.1967). Whether a plaintiff has exercised the degree of diligence necessary to toll the statute of limitations is a question of fact. *Cotten v. Republic National Bank of Dallas, supra,* at 946; *L.C.L. Theatres v. Columbia Pictures Industries, Inc.,* 566 F.2d 494, 497 (5th Cir. 1978).

Moody argues that all causes of action in the present case accrued upon the conclusion of Empire's acquisition program in 1968, because by that time Empire's disinterested shareholders and directors and the various insurance commissioners involved had knowledge of facts from which they could have inferred the existence of any common law violations. The jury, however, found in response to special interrogatories that Moody concealed material facts from all these persons, and that reasonable diligence would not have alerted them to Moody's wrongful acts before March 1971.

█ The jury's findings are supported by the evidence. Empire's shareholders were explicitly informed in Empire's 1965 annual

---

8. Receiver's state law claims are governed by a two-year limitations period. *See* Tex.Rev.Civ. Stat.Ann. art. 5526(4) (repealed effective August 27, 1979); *White v. Bond,* 362 S.W.2d 295

(Tex.1962). In light of our disposition of the 10b–5 issue, *see section* (II)(B)(2), *infra,* we need not decide the applicable limitations period for that claim and whether it was tolled.

report that the $14,403,200 valuation of the life interest was calculated by Ernst & Ernst and by actuaries including Lloyd Friedman; every subsequent report to shareholders until 1972 continued to assign the life interest a $14,403,200 value.[9] Three of Empire's directors, Hilton Painter, Frank Schmidt and Richard Linn, testified at trial that they were led to believe the increased valuation was based upon an appraisal by an accounting or actuarial firm. R. Frank Ussery, Alabama's Superintendent of Insurance from December 1968 to January 1971, testified that he, too, believed the increased valuation was based on assumptions provided by an accounting or actuarial firm. The jury could reasonably have found that the reliance of these persons on Moody's representations was justified, and that their diligence was sufficient to toll the statute of limitations.

### 3. Equitable Estoppel

In April 1975, three years after the present action against Moody was initiated, Receiver entered into an agreement to effectuate a bulk reinsurance treaty with Protective Life Insurance Company of America ("Protective"). Under this treaty Protective acquired virtually all of Empire's assets and liabilities. Receiver retained Empire's rights of action against Moody, but agreed to pass along to Protective any recovery obtained from Moody. Since Empire's liabilities exceeded its assets, Protective stipulated that it would reinsure only those Empire policyholders who accepted a ten-year moratorium on the right to receive the cash values of their policies. Protective and Receiver agreed that any recovery against Moody would inure to the benefit of those policyholders by reducing the moratorium amount established under the treaty.

Moody contends that Protective is the real plaintiff in interest under these facts, and that any recovery against Moody would unjustly enrich Protective in violation of the equitable principles enunciated in Ban-

gor Punta Operations, Inc. v. Bangor & Aroostook Railroad, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). In Bangor Punta the Amoskeag Company ("Amoskeag") purchased virtually all the stock of the Bangor & Aroostook Railroad ("BAR"). BAR subsequently sued its former owner for corporate waste and mismanagement. The Supreme Court held that equity precluded BAR from maintaining the action, reasoning that although the suit was purportedly brought on BAR's behalf, the real party in interest and the principal beneficiary of any recovery was Amoskeag. Since the depressed price Amoskeag had paid for BAR's stock already reflected the effects of the earlier mismanagement, any recovery would constitute a "windfall" for Amoskeag.

Bangor Punta is distinguishable from the present case in several respects.

First, Protective in this case, unlike Amoskeag in Bangor Punta, cannot fairly be considered the principal beneficiary of any recovery against the injured corporation's former owner. Although Protective might benefit derivatively from such recovery, the principal beneficiaries under the express terms of the reinsurance agreement are the policyholders of Empire. These policyholders are Empire's creditors, and have suffered direct injury as a result of Moody's improprieties. By contrast, the Supreme Court in Bangor Punta stressed that Amoskeag was not suing on behalf of the injured corporation's creditors, 417 U.S. at 718 n. 15, 94 S.Ct. at 2587 n. 15, and had not itself suffered any injury, 417 U.S. at 711–12, 94 S.Ct. at 2583–84.

Second, even if Protective were the principal beneficiary of any recovery in this case, it still could not fairly be considered the beneficiary of a "windfall." The Supreme Court's finding in Bangor Punta that any recovery against BAR's former owner would constitute a windfall for Amoskeag turned on the fact that Amoskeag received all it had bargained for when it acquired

---

**9.** Absent cause to question them, it is reasonable for shareholders to rely on the knowledge and integrity of the corporate managers with respect to shareholder reports. DeHaas v. Empire Petroleum Co., 435 F.2d 1223, 1227 (10th Cir.1970).

BAR's stock. In the present case, however, Protective did *not* receive all it had bargained for when it acquired Empire's assets since it had sought and obtained an agreement that any recovery against Moody would be applied to reduce the policyholder's moratorium. Far from being an unexpected gain, a recovery against Moody was clearly contemplated by Protective and provided for in its reinsurance agreement with Receiver.

■ Finally, in *Bangor Punta* there was no lawsuit, and there could have been no lawsuit, until Amoskeag acquired BAR's stock. By contrast, Empire initiated this action against Moody several years before Protective acquired Empire's assets. Moody is thus urging us to *extinguish* a cause of action that both existed and was pursued long before the transfer of Empire's assets took place. Neither law nor equity permits us to do so. Empire suffered a cognizable injury for which a remedy exists. To hold that the remedy abates because the corporation's assets were sold would result in inequity that the Court in *Bangor Punta* sought to avoid, and would make Moody himself the beneficiary of a windfall. *See National Union Electric Corporation v. Matsushita Electric Industrial Co.,* 498 F.Supp. 991, 1003 (E.D.Pa.1980). Receiver is not equitably estopped from bringing this action under the principles enunciated in *Bangor Punta*.[10]

■ Moody also argues that Receiver is equitably estopped from bringing this action because Moody increased the value of the life interest and pursued the subsequent acquisition program in reliance on the approval issued by Empire's shareholders and board of directors and the Alabama Department of Insurance. The sole virtue of this contention is audacity. The doctrine of estoppel is for the protection of innocent persons, and only the innocent may invoke it. A party may not invoke an estoppel for the

purpose of shielding himself from the results of his own fraud, dereliction of duty, or other inequitable conduct. *El Paso National Bank v. Southwest Numismatic Investment Group, Ltd.,* 548 S.W.2d 942, 949 (Tex.Civ.App.—El Paso 1977, no writ). Moreover, a party invoking estoppel must be ignorant of the facts which the party to be estopped is alleged to have represented by his conduct or silence. *Investors Realty Trust v. Carlton Corp.,* 541 S.W.2d 289, 292 (Tex.Civ.App.—Dallas 1976, no writ); *Clifton v. Ogle,* 526 S.W.2d 596, 603 (Tex.Civ. App.—Fort Worth 1975, writ ref'd n.r.e.). Moody is in no position to invoke an estoppel against Receiver.

## B. *Liability*

### 1. *Common Law*

#### a. *Applicable Law*

■ A threshold issue concerns the law to be applied in determining the nature and extent of Moody's fiduciary obligations to Empire. We apply the conflict of law principles of Texas (the forum state) in resolving this issue. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Specifically, we look to the Texas Business Corporation Act (the "Act"), which was enacted in 1955 and in force at all times relevant to this lawsuit.

■ Tex.Bus.Corp.Act Ann. art. 9.14(A) (Vernon) provides that the Act does not apply to foreign corporations which are granted authority to transact business within the state under any special statute, except that, where the special statute contains no provision regarding matters provided for in the Act with respect to foreign corporations, the Act applies to the extent it is not inconsistent with the special statute. Insurance companies are among those foreign corporations authorized to transact business

---

**10.** It bears noting as well that *Bangor Punta* involved a transfer of stock rather than assets. Moody cites no case, and we have found none, in which *Bangor Punta* is applied to preclude recovery by a plaintiff who has acquired a corporation's assets rather than its stock. This

is hardly surprising, since the transferee of a corporation's assets has no right of action against the corporation's prior owners for mismanagement unless the transfer agreement gives it such a right—in which case any recovery would not constitute a "windfall."

in Texas under a special statute. *See* Tex. Ins.Code Ann. art. 3.57, 21.43 (Vernon). The Texas Insurance Code nowhere specifies the duties or liabilities of officers or directors of insurance companies. The Texas Business Corporation Act, on the other hand, provides that officers and directors of a foreign corporation doing business in the state are subject to the same duties and liabilities as are imposed upon officers and directors of domestic corporations. Tex. Bus.Corp.Act Ann. art. 8.01, 8.02; *see* Model Business Corporation Act § 99 par. 1 ¶ 2.02(3) (1960). Nothing in the Texas Insurance Code is inconsistent with this provision. We conclude that Moody was subject to the same duties and liabilities that Texas law imposes upon officers and directors of Texas corporations.

### b. *Breach of Duty of Care*

 Texas law imposes on corporate officers and directors a duty to exercise due care in the management of the corporation's affairs. If they breach that duty, they are liable to the corporation for any loss it may suffer as a result of their neglect. *See Sutton v. Reagan & Gee,* 405 S.W.2d 828, 834 (Tex.Civ.App.—San Antonio 1966, writ ref'd n.r.e.); *Fagan v. La Gloria Oil & Gas Co.,* 494 S.W.2d 624, 628 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ). "Due care" is that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances.

The jury found in response to special interrogatories that Moody negligently managed Empire's business affairs and breached his fiduciary duties to the company. The jury also found that Moody's behavior amounted to "intentional misconduct or gross negligence." The jury thus accepted Receiver's contention that Moody was at least grossly negligent in undertaking a massive acquisition program based on an artificial surplus created by the $14,403,200 revaluation of the life interest.

Moody here asserts that both the revaluation of the life interest and the subsequent acquisition program involved legitimate exercises of business judgment. Moody first contends that his revaluation of the life interest was reasonable since it was based on appraisals made by accountants and/or an actuary. The evidence is to the contrary. Hogan of Ernst & Ernst and Jard of Peat Marwick both testified that they did not revalue the life interest; indeed, Hogan stated he did not learn of the revaluation until the time of trial. He testified that the trial was the first occasion that Ernst & Ernst even had knowledge that its name had been used in Empire's 1965 annual report with the false statement that the $14 million valuation of the life interest had been calculated by his firm. Lloyd Friedman, the actuary who Moody now claims was chiefly responsible for the revaluation, testified that he did nothing more than determine Moody's life expectancy and make mathematical calculations based upon economic assumptions provided by Moody. Moody rebutted none of this testimony, and all of it is fully corroborated in the record. The conclusion is inescapable that the $14,403,200 value was placed on the life interest by Moody himself.

 Moody next contends that, whether or not outside experts were responsible for the revaluation, $14,403,200 was a reasonable value to place on the life interest. In particular, he argues that it was reasonable to raise the life interest's assumed growth rate from 5% to 7½% (thereby boosting the life interest's value by millions of dollars) because ANICO's dividends, which constituted virtually all of the life interest's income, had enjoyed a 19% average annual growth rate between 1944 and 1964. This argument is easily met by noting that Ernst & Ernst was familiar with ANICO's earnings record when it found an assumed growth rate of 5% to be most reasonable. Moreover, ANICO's subsequent earnings history vindicated Ernst & Ernst's conservatism: between 1964 and 1974, the years here at issue, ANICO's dividends increased at an annual rate of only 4.62%. Finally, the $14,403,200 valuation was clearly unreasonable in relation to the life interest's income; between 1966 and 1970 the highest

annual yield on the life interest at the $14 million valuation was 1.52%. Thus, between 1966 and 1970 the average amount of income that the life interest actually brought Empire each year was only about $200,000, an amount grossly disproportionate to its valuation. One expert testified that life insurance companies during those years generally guaranteed their policyholders a return of between 2½% and 3% on ordinary life insurance policies, and that the minimum yield on an asset required to guarantee such a return prudently was 3½%.[11]

Even if Moody's $14,403,200 valuation of the life interest had been reasonable, his subsequent course of conduct was not. Moody had reason to know that the life interest's value was extraordinarily volatile, having seen it leap from $5,813,440 to $14,403,200 within a space of six months. Moody also knew, or should have known, that if he expended Empire's liquid assets in an acquisition program any significant decline in the life interest's value would instantly render Empire insolvent. Moody nevertheless embarked upon a massive acquisition program that drained Empire of its liquid assets and made the company's economic survival depend entirely on the stability of the life interest's value. The jury could reasonably find that Moody was grossly negligent in failing to provide for the contingency that in 1972 became a reality—a sudden and substantial decline in the life interest's value.

■ The jury's finding that Moody was grossly negligent in his management of Empire is supported by the testimony of numerous witnesses at trial. Hilton Painter, who served Empire for ten months as vice-president and director, testified that Moody was "totally incapable of operating a life insurance company," and ran Empire in an illogical, irresponsible and dangerous manner.[12] Frank Schmidt, also an Empire vice-president and director, testified that Moody's aggressive acquisition program ran

11. Moody also contends that, even if the $14,403,200 revaluation of the life interest were unreasonable, he is not responsible for Empire's subsequent losses because the Alabama Insurance Commissioner approved the revaluation. This contention is spurious. An insurance company may not delegate responsibility for valuation of its assets to a state agency, and the mere fact that an insurance commissioner accepts a company's asset valuation does not immunize the company from liability arising from that valuation.

12. The testimony of several witnesses at trial supports the conclusion that Moody often exhibited a blatant, callous disregard for the interests of Empire's shareholders and policyholders, especially when their interests conflicted with his own ambitious plans for the company. For instance, the following excerpt from Mr. Painter's testimony highlights one such incident that occurred during a meeting of Empire's executive committee of directors and officers:

[Mr. Hilton]:
A question arose concerning the expenditure of certain funds to acquire a minority position in another life insurance company and, as often happens in a meeting like that, there is some discussion about where the money comes from.
Q. (By Mr. Wright) Was Mr. Moody there?
A. Mr. Moody was chairing the meeting, yes sir.
Q. All right, what happened?
A. And I made the comment to Mr. Moody that—that such an expenditure would not be an acceptable expenditure because it constituted the use and, in my opinion, the unauthorized use of policyholder reserves.
Q. What was Mr. Moody's reply?
A. (No response).
Q. Precisely?
A. Mr. Moody was standing at the end of the table—
THE COURT:
What was his reply?
THE WITNESS:
His reply was, "F__k the policyholders."
Q. (By Mr. Wright) All right, Mr. Painter, I take it you've heard that word used before in your adult life?
A. Yes.
Q. I want to ask you this: Have you ever heard the use of that particular profanity in a jocular manner?
A. Yes.
Q. Heard it simply used as an adjective to highlight something?
THE COURT:
Just ask him.
Q. How do you interpret that that phrase was meant at that time?
A. He said it without a trace of smile and it was very clear that he meant it in the crudest and most malicious way.

the company into bankruptcy. Laurence Cottingham, an attorney in Empire's legal department, stated that Moody "violated all rules of good management." Thomas Pennington, a vice-president of Protective, testified that Empire's investments were poor to atrocious with limited exceptions, that policy records were poorly maintained and incomplete, that documentation on policies assumed from acquisitions was virtually non-existent, that the administration of the reinsurance program indicated gross negligence, and that Empire was "probably the worst managed company" he had ever seen. The jury's finding of gross negligence on the part of Moody is amply supported by the evidence.

 Moody also argues that the district court erred in its instructions to the jury regarding the law applicable to directors' duty of care. First, he challenges the court's instruction that he was to be "held to a higher standard of care and fair-dealing than would be one not in a fiduciary position." This instruction is, however, patently correct. *See* 15 Tex. Jur.3d, "Corporations," § 235 (1981); H. Henn, *Law of Corporations* §§ 234, 235 (2d ed. 1970). Second, Moody complains that the court failed to instruct the jury regarding the applicability of the business judgment rule. This complaint, too, is fatuous: the court explicitly instructed the jury that directors "are not held responsible for ordinary mistakes of business judgment," and that "if Moody exercised reasonable business judgment in the acquisition program and perpetrated no fraud he is not liable to the receiver in this case however mistaken his actions might appear to be in hindsight." *See Conrick v. Houston Civic Opera Ass'n,* 99 S.W.2d 382, 384 (Tex.Civ.App.—Amarillo 1936, no writ); Henn, *Corporations* at § 242. Finally, Moody asserts that the court erred in instructing the jury that Moody owed fiduciary duties to the policyholders of Empire, as well as its stockholders and the corporate entity itself. We are not certain that this instruction was erroneous. *See, e.g., American Trust Co. v. California Western States Life Insurance Co.,* 15 Cal.2d 42, 98 P.2d 497, 510 (1940); 18 J.

Appleman, *Insurance Law and Practice* § 10012 (1945). Even if this instruction were erroneous, the error was harmless.

### 2. Securities Law Claims

The jury in this case found that Moody had engaged in conduct in violation of Securities Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1981), enacted pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976). Specifically, the jury found that Moody (1) failed to disclose his belief that the trust interest was intended to be non-transferable by Empire, and (2) fraudulently misrepresented the value of the life interest. Moody raises a variety of arguments in this appeal contesting the jury's findings of liability under Rule 10b–5. We need not decide, however, whether the jury's findings and the district court's holding of liability under this ground were correct, because the damages awarded may be sustained on the basis of the common law claims.

At the close of trial, the court submitted 17 special interrogatories to the jury. Question 1 asked whether Moody was negligent in his management of Empire; Question 2 asked whether Moody breached his fiduciary duties to Empire; Question 3 asked whether such negligence or breach of fiduciary duties constituted intentional misconduct or gross negligence; Question 4 asked whether Moody breached his fiduciary duties in connection with the guarantee of Credit Factoring's indebtedness to Moody Bank; Question 5 asked whether such negligent mismanagement or breach of fiduciary duties proximately caused damage to Empire stockholders' capital and surplus or Empire's ability to meet its policyholders' obligations; and Questions 6–9 cumulatively asked whether Moody violated the securities laws. The jury answered all these questions affirmatively. Question 10 then stated:

> Find from a preponderance of the evidence, what sum of money, if any, if paid now in cash would fairly and reasonably compensate Empire for damages cause

[sic] by the depletion, if any, of its stock-holders' capital and surplus proximately caused by such negligent mismanagement, breach of fiduciary duties or securities violations as you may have found. The jury answered: "five million dollars."

■■■ Moody argues that it is impossible to determine whether the jury based its assessment of $5,000,000 compensatory damages on the allegedly improper securities law theory or on the common law theory, and that the case must therefore be remanded for a new trial. This contention fails for several reasons. First, it is clear from the jury's answers to Questions 1–5 that it found Moody liable under common law independent from and without reference to his liability under Rule 10b–5. Second, although Question 10 is phrased in the disjunctive, the *measure* of damages recoverable by Receiver under Texas common law is the same (as will be demonstrated below) as it is under Rule 10b–5. Furthermore, there was only one wrong complained of and proved: the manipulation of the life interest leading to fatal undercapitalized acquisition; and the proof of damages on the depletion of capital was the same and not linked only to one theory of liability. Thus, the $5 million figure assessed by the jury may stand irrespective of Rule 10–b liability.[13]

### C. Damages

#### 1. Measure of Damages

■■■ The district court makes the following statement in its opinion:

What is not clear is how to measure the loss to Empire. Neither Texas law nor federal securities law provides a clear guideline, so this court must fashion a measure of damages which comports with the sparse precedent available and which

is just. *See Spiegel v. Beacon Participations,* 297 Mass. 398, 8 N.E.2d 895, 909 (1937). There being no indication otherwise, the court presumes that the measure of damages for Receiver's common law and securities law claims does not differ under state and federal law. *Cf. Pappas v. Moss,* 303 F.Supp. 1257, 1281 (D.N.J.1969).

475 F.Supp. at 237. We believe that the district court's "presumption" on the measure of damages was correct. To understand this conclusion, it is necessary to examine briefly the types of damages available under Rule 10b–5 and common law.

First, it is well-settled that Rule 10b–5 allows recovery of both general and special (or consequential) damages. 5B A. Jacobs, *The Impact of Rule 10b–5* § 260.03[b] (rev. ed. 1980). Special damages are defined as outlays attributable to the defendant's wrongful conduct. *Id.* at § 260.03[d]. Two limits exist on the recovery of special damages: (1) they cannot be awarded if their relationship to the defendant is too remote; (2) they are unavailable if they redress the same injury for which the plaintiff is compensated by general damages or prejudgment interest. *Id.* It is significant to note, however, that special or consequential damages are recoverable even if the plaintiff can show no general damages. *Id.*

■■■ Likewise, Texas common law recognizes and allows both general and special damages as a recovery for acts of fraud or deceit. Although we have found no Texas cases specifically addressing the common law liability of a director/president/majority stockholder who violates his fiduciary duties through mismanagement and thereby forces the corporation into insolvency, we determine that Texas law allows special damages against Moody under the facts

---

**13.** Moody cites *Dougherty v. Continental Oil Co.,* 579 F.2d 954, 960 n. 2 (5th Cir.1978), *vacated,* 591 F.2d 1206 (5th Cir.1979) in support of his argument. That case is inapposite, however, because the ambiguity there concerned not the theory on which damages were based but the theory on which liability was based. Here it is clear that the jury found liability under *both* theories. Their answers to Questions 1–5 clearly indicate a finding of liability under common law and their answers to Questions 6–9 clearly indicate a finding of liability under federal securities laws. In this case it is irrelevant upon which theory the jury based its finding of damages in Question 10 because, as discussed in text, the measure of damages is the same under either theory.

here. Examining Texas cases in three factual situations reported upon by the state courts is instructive. Specifically, we look to cases involving: (1) directors who cause the financial condition of the corporation to be misstated, thereby inducing creditors to loan money to the company; (2) the common law actions of fraud and deceit, and types of damages recoverable thereunder; and, (3) negligent corporate mismanagement by directors.

As to the first category, it appears that the Texas courts have long permitted third-party creditors to recover damages personally against corporate directors who fraudulently or even negligently misrepresent the financial condition of the company. Tex. Jur.3d summarizes Texas law in this fashion:

> Directors of a corporation are personally liable to anyone who sustains loss by reason of false financial statements made by them. For example, directors have been held personally liable at common law for inducing deposits in a failing bank by representations of its solvency. Of course, the officers are liable if the false statements are shown to have been fraudulently · or designedly made. So, also, where an officer has been concerned in the publication of false statements, he is liable for those statements even though he was in fact ignorant of their truth and falsity; it is his duty to inform himself of the true financial position of the corporation.
>
> Directors, in particular, are in a position of special responsibility, in view of the statutory provision vesting in them the general management of the affairs of the corporation. Directors are accordingly held liable, as a matter of law, where it appears that they allowed false statements to be published and used by employees in order to obtain credit for the corporation.

15 Tex.Jur.3d, Corporations § 300 at 455–56 (1981) (footnotes and case citations omitted).

The seminal Texas case illustrating this rule is *Cameron v. First National Bank,* 194 S.W. 469 (Tex.Civ.App.—Galveston 1917, writ ref'd), a case in which the plaintiffs extended a line of credit to a manufacturing corporation in reliance on false and fraudulent statements of the company's financial condition as contained in the annual report. The court found that the defendant/directors "knew the method by which the accounts of the mill were kept, and that it has been the uniform custom in preparing financial statements to include in such statements as assets accounts which had proven uncollectable and which by general commercial custom and usage should not be included in a financial statement as assets." *Id.* at 476. Concluding that the directors' authorization of the issuance of such financial statements constituted failure to exercise ordinary care, the court held that "having accepted the position and exercised the duties of directors, and having sanctioned the long-continued method of borrowing money for the company on the faith of yearly financial statements, appellants must be held responsible for the truth of the statements so sanctioned by them." *Id.* See *Durham v. Wichita Mill & Elevator Co.,* 202 S.W. 138 (Tex.Civ.App.—Fort Worth 1918, writ ref'd) (similar facts; holding directors liable for fraud and negligence even though plaintiff/creditor did not extend credit wholly in reliance upon false financial statements of corporation); *see also Parsons v. Johnson,* 28 App.Div. 1, 5, 50 N.Y.S. 780, 782 (1898) ("[A]n officer of a corporation making a false statement in the annual report becomes liable to the damages which naturally flow from or are caused by the falsehood. The Legislature has not undertaken to define the precise damage which the injured party may recover, but has used a broad term which covers all damages which flow directly from the false statement.").

The above cases dealing with the liability of directors to corporate creditors for false financial statements are grounded upon common law theories of

negligence or fraud, or both.[14] Although the common law of fraud is generally more stringent in its requirements than the elements of Rule 10b–5, it is clear that the two are closely related. In Texas in an action for common law fraud or deceit, a plaintiff must allege and prove: (1) an untrue representation made by the defendant (2) known by him to be false (3) concerning a material fact (4) made with the intent to deceive the plaintiff and (5) to induce him to act in a particular manner, (6) such representation being one on which the plaintiff relied and (7) which proximately caused his damages, (8) with issues on proximate cause having to be submitted to the jury where "special" damages are sought. See *Success Motivation Institute, Inc. v. Lawlis,* 503 S.W.2d 864, 868 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.); *El Paso Development Co. v. Ravel,* 339 S.W.2d 360, 367 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r. e.). Thus *all* of the requirements of a Rule 10b–5 cause of action are included within the elements of fraud under Texas law, which imposes a few additional requirements. *Cf. Huddleston v. Herman & MacLean,* 640 F.2d 534, 543 (5th Cir.1981), *modified,* 650 F.2d 815, *cert. granted,* 456 U.S. 914, 102 S.Ct. 1766, 72 L.Ed.2d 173 (1982).

▆▆▆ Moreover, in Texas a defrauded plaintiff may recover both general and special damages, with these terms having approximately the same meaning as they do when one is talking about Rule 10b–5. The difference between general and special damages under Texas law is that general damages are the necessary and usual result of the wrong complained of, while special damages need not be the necessary and usual result of the wrong, but must be the

proximate result thereof. *El Paso Development,* 339 S.W.2d at 363. "Special damages, predicated upon a wrong, which are not necessarily the usual result of the wrong, but are directly traceable to the wrongful act complained of and result therefrom, may be recovered in a common law action based on fraud and deceit; but all other damages will be held to be too remote." *Id.* at 363–64. Thus, Texas law limits special damages to those which are not too remote, uncertain, conjectural, speculative or contingent. *Id.* at 364.

The third and final category of Texas cases that is relevant is that addressing the liability of directors or officers for *negligent* (i.e., nonfraudulent) mismanagement of a corporation. For example, in *Sutton v. Reagan & Gee,* 405 S.W.2d 828 (Tex.Civ. App.—San Antonio 1966, writ ref'd n.r.e.), the court entertained a mismanagement action filed by a creditor of a bankrupt corporation against its officers. Although the court held that such a suit was not maintainable by an individual creditor of the corporation, it acknowledged such a cause of action is enforceable by the receiver or trustee in bankruptcy of the corporation. *Id.* at 834. With regard to the measure of liability, the court stated that a director owes a duty to the corporation to exercise due care in the management of the corporation's affairs, and for breach of this duty, the director is "clearly liable to the corporation for any loss it may suffer as a result of his neglect." The words "any loss" suggest that special or consequential damages are recoverable in an action brought for negligent corporate mismanagement against the director of a corporation; *accord, Fagan v. La Gloria Oil & Gas Company,* 494 S.W.2d 624, 628 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ).

---

**14.** We emphasize that we do not here decide the liability of a director for false financial statements when such director is ignorant of the facts underlying the misrepresentation. In *Sugarland Industries v. Parker,* 293 S.W. 609, 612 (Tex.Civ.App.—Texarkana 1927, writ dismissed), the court noted that "if in the transaction which is in suit it is affirmatively shown that any individual director did not have actual participation or knowledge, a claim of fraudulent or false representation cannot be predicat-

ed against him. A director is liable only for his own acts or omissions. He is not merely by virtue of his position liable." In the instant case, Moody's fraudulent and/or negligent misrepresentation of the financial state of Empire is established by the evidence, and he is the only director/defendant before us. As to the liability of a director ignorant of the facts, we are not now called upon to decide that question, but note in passing that we agree generally with the court's position in *Sugarland.*

From the preceding discussion it is clear that Texas common law:

(1) holds directors liable to third-party creditors who act in partial reliance upon false financial statements that appear in the annual report of a corporation by the authorization of the directors.

(2) on fraud includes *all* of the elements of a Rule 10b–5 cause of action, and permits general and special damages to be recovered.

(3) holds directors who negligently mismanage a corporation liable for "any loss it may suffer as a result."

Finally, it is also clear that both federal and state courts, in awarding damages for violation of Rule 10b–5, have not insisted that the amount of damages be proven with mathematical certainty. Courts have routinely placed upon the defendant the risk of imprecise calculations of damages:

> Although the plaintiff must present as much proof as he can, the defendant has no ground to complain if the plaintiff cannot prove the extent of his injury (as distinguished from the fact he was harmed) with mathematical certainty. In effect, the defendant bears the uncertainty as to the amount of damages.

*Jacobs,* § 260.02 (footnotes and case citations omitted). Thus, given the obvious parallels between the Texas common law action for fraud and Rule 10b–5's elements, and the fact that both recognize and similarly define general and special damages, we conclude that the district court was correct in presuming that the measure of damages for Receiver's common law and securities law claims does not differ under state and federal law.

**15.** The damages here are, if anything, "special" or consequential damages because they are not the "necessary and usual result" of Moody's fraudulent valuation of the life interest, but rather are, as George's testimony (recounted in the text) shows, the proximate result thereof.

### 2. *Proof of Damages*

Once we accept the premise that the measure of damages are the same under federal or state law, the sole remaining question is whether Receiver adequately proved the *amount* of damages, *i.e.,* whether the evidence at trial supported the jury's verdict.[15] As we examine the evidence, we keep in mind the principle, already stated, that Moody should bear any uncertainty as to proof of the amount of damages and that Receiver need not demonstrate the amount with mathematical certainty.

As recounted earlier, the jury in response to special interrogatories found that $5 million would "fairly and reasonably compensate Empire for damages caus[ed] by the depletion ... of its stockholders' capital and surplus proximately caused by [Moody's] negligent mismanagement, breach of fiduciary duties [and federal] securities violations ...." The jury also awarded $1 million in punitive damages against Moody. This verdict was rendered in 1976; thereafter, Moody's lawyers filed an avalanche of post-trial motions raising over 80 alleged grounds of error that delayed the district court's entry of final judgment until 1979.

Moody's attack on damages denounces what he characterizes as the numerous and "outrageous" errors of the district court. From his many briefs and supplemental briefs and letters filed in this appeal, we perceive his attack on the damages to be five-fold. First, he contends that Jim George used an improper method of accounting in calculating the value of Empire's assets. Second, he argues that Receiver was relieved of the burden of proving Empire's insolvency by being allowed to rely upon a prior adjudication of this matter in the Alabama courts. Third, Moody attacks the jury's award of $1 million in punitive damages.[16] We find no merit to

**16.** Moody raises two other arguments which relate more closely to damages recoverable for a Rule 10–b violation.

First, he argues that George's testimony did nothing more than demonstrate a dilution of Empire's shareholders' equity, which Moody claims is not a compensable loss under existing precedent in this circuit. As support for this

his contentions. Before we discuss them, however, we summarize the damages evidence.

At trial the chief damages witness for Receiver was Jim George, a manager in the Insurance Department of Alexander Grant & Co., a national accounting firm, and a former life insurance specialist with the international accounting firm of Peat, Marwick, Mitchell & Co. George testified that Alexander Grant & Co. had been retained by Receiver "to put together a complete accounting picture absent performing an audit of the entities involved in the birth, growth and demise of Empire . . . ." As a result, George and the Insurance Department of Alexander Grant spent over one year examining the records and books of Empire for the period from 1963 to 1972. Scrutinized in the process were minutes of meetings of the board of directors, executive committee, and shareholders, proxy statements to shareholders, bulk reinsurance agreements and consents of insurance commissioners, mortgage loan files, annual financial statements, reports of state insurance examining departments, memoranda of officers and directors of Empire and its subsidiaries and controlled affiliates, and documents related to Empire's interest in the Libbie Shearn Moody Trust, including Ernst & Ernst's valuation of the trust.

proposition, Moody cites a progression of Fifth Circuit cases, including: *Herpich v. Wallace,* 430 F.2d 792 (5th Cir.1970); *Wolf v. Frank,* 477 F.2d 467 (5th Cir.), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); and *Sargent v. Genesco, Inc.,* 492 F.2d 750, 765 (5th Cir.1974). In essence, Moody's argument is a back-handed attempt to attack Receiver's standing to maintain the Rule 10b–5 cause of action. He points particularly to *Wolf v. Frank,* a case in which the district court dismissed the plaintiffs' individual 10b–5 claim because they "were unable to show any actual damages inasmuch as the dilution of their equity interest was not a cognizable element of damages for a violation of Rule 10b–5." 477 F.2d at 478. We affirmed the district court's action on the basis of our earlier opinion in *Herpich v. Wallace,* stating that the plaintiffs "[did] not have standing to seek individual damages for the dilution of equity interest caused by the [stock exchange in question] because plaintiffs were neither purchasers or sellers in connection with that transaction." *Id.*

Moody's argument misperceives our previous holdings in these cases. All three of these cases very plainly held that shareholders could assert a 10b–5 *derivative* action on behalf of a corporation although they were neither actual purchasers nor sellers. 430 F.2d at 809–10; 447 F.2d at 478–79; 492 F.2d at 762–66; *see Imperial Supply Co. v. Northern Ohio Bank,* 430 F.Supp. 339, 348 n. 6 (N.D.Ohio 1976). The present case is just such a derivative suit brought by Receiver, and so, even if we were to reach the issue of 10b–5 liability, it is clear that Receiver would have standing to assert such a claim. Moreover, the cases cited by Moody do not hold that dilution of stockholders' equity is never a compensable loss in 10b–5 actions, whether derivative or direct. They merely hold that dilution of shareholders' equity does not confer "purchaser" or "seller" status on a plaintiff seeking to overcome the standing hur-

dle in a direct 10b–5 suit. Perhaps this distinction is best expressed by the court in *Sargent:* "Thus, although dilution of equity may be an appropriate measure of damages, such dilution does not confer standing." 492 F.2d at 765 (emphasis added).

Moody also argues that the district court should have awarded damages, if at all, under the "out-of-pocket" theory which, as he points out, is the usual measure of damages applied in Rule 10b–5 cases. Our declining to reach the issue of 10b–5 liability does not necessarily answer this argument because, as we have pointed out before, the "out-of-pocket" theory may also be applied at common law. *Huddleston v. Herman & MacLean,* 640 F.2d at 555 & n. 34. We reject it as the proper measure of damages here, though, for the following reason. Under the out-of-pocket rule, a defrauded buyer is entitled to recover the difference between the price paid for securities and the real value when bought. *Id.* at 555–56. Under the unusual facts here, it is questionable whether this measure of damages could properly be applied to ascertain Empire's losses through its mergers and outright purchases of shares in other corporations for no allegation has ever been made that Empire did not receive "full value" when acquiring these securities, yet the evidence overwhelmingly demonstrates, as we have discussed in the text, that Empire suffered huge, tangible damages in the millions of dollars because of these acquisitions. Moreover, the acquisition program also involved the purchase of blocks of life insurance policies through bulk reinsurance agreements; such purchases did not involve securities, *see* 475 F.Supp. at 245. Thus, application of the out-of-pocket rule makes no sense in assessing damages suffered by Empire as a result of this aspect of its acquisition program. Yet these reinsurance agreements no less than the mergers and purchases of securities caused injury to Empire and were clearly compensable under the state law mismanagement action.

George presented the results of this exhaustive analysis in his testimony at trial; the transcription of his testimony on direct examination alone covers 94 typewritten pages in the record before us. Basically, George described to the jury his method of measuring the damages suffered by Empire:

All I did was take the years '64 through '72 as reported by the company, shoved them together and said fine, now summarize what caused the change in stockholders equity to be in the beginning three hundred ninety-four thousand and at the end, '72, be a $7,000,000 deficit, or a swing, if you please, of $7,400,000.

George concluded, based on his analysis of the change in stockholders' equity from Empire's inception to its ultimate receivership, that the cause of Empire's downfall was the aggressive acquisition program it had pursued; he also explained that the acquisition program would not have been possible without the artificial inflation of the trust value from $5,813,440 to 14,403,200:

Q. [Counsel for Receiver]:
Out of that study, we'll go back and analyze the segments, give us the ultimate conclusions.
Was there any particular cause of the company's collapse or were there hundreds of causes that are reflected by your studies of the financial history of Empire life?

A. [George]:
To point to one thing and say this caused, this transaction caused the demise, you couldn't do. You have to look at the entire program.
It was the total impact of the merger acquisition program creating huge drains on surplus of the insurance company that triggered or caused its insolvency.

Q. Did you come to any conclusion as to how Empire Life was able to embark and effectuate this acquisition program that you spoke of?

A. Yes, this is what I was trying to get across [a] while ago.
The contribution of the Trust Interest created equity, if you please, of $14,000,000. Had that equity not been there, it's my opinion that a merger acquisition program of the magnitude executed by the company could not have been done, could not have been attempted. The $14,000,000 increase in equity provided a right or a license, if you please, to use assets of the company to go on a merger acquisition program.

George also explained that the acquisition program had resulted in Empire's obtaining assets that, when valued under statutory accounting principles as required by state insurance law, were nonincome producing and had to be valued below their cost. In short, his testimony explained how Moody's acquisition scheme caused Empire to exchange liquid assets deemed "admitted" under state law, e.g., cash and marketable securities, for nonliquid assets statutorily valued at significantly less than cost. This left Empire with inadequate liquid assets, i.e., cash reserves, with which to pay its routine obligations such as policyholders' claims.[17] George testified that the difference between cost and statutory value of the property acquired by Empire was $9,207,242, i.e., Empire's liquid and admitted assets were reduced by this amount as a result of the acquisitions. The low statutory value of the acquired property and its nonliquidity, when coupled with the sudden reduction in value of the trust interest by

---

17. In fact, the exchange of Empire's liquid, admitted assets for nonliquid, nonadmitted ones at times left Empire with little more than the income produced by the life interest to back up its routine obligations. Yet as noted earlier, although the life interest was valued at over $14 million, it only brought in about $200,000 yearly in actual income, an amount clearly inadequate to cover payments to policyholders and other business operating expenses. At trial an insurance examiner/expert for the State of Oklahoma, Ben Larson (who had studied Empire's financial condition in detail), testified that Empire's liquid capitalization was seriously inadequate to cover routine obligations even *before* the value of the life interest was inflated from $5 to $14 million.

the Alabama Insurance Commissioner, rendered Empire statutorily insolvent. George reiterated that such insolvency was caused by the acquisition program:

Q. [Counsel]:

Was there any other cause reflected by the—your study of the financial statements that could have made—placed Empire Life Insurance Company into receivership, in an insolvent posture?

A. [George]:

I keep coming back to the same answer, the acquisition program.

George then stated that, in his view, Empire had suffered damages of somewhere between $7 and $10 million dollars. The $7 million or bottom figure was his calculation of the deficit and drain on shareholder equity caused by the acquisition and merger program; the top or $10 million figure represented the $14 million excess of Empire's liabilities over assets at the time it entered its bulk reinsurance agreement with Protective Life Insurance Co., less the $4 million value of the Moody trust interest at the time Empire entered receivership. George's extensive analysis and conclusions were borne out by the testimony of three other experts at trial (including former directors and officers of Empire) as was set forth in the opinion of the district court. 475 F.Supp. at 240.

### a. *Asset Valuation*

Moody's most vehement attack on the damages evidence is directed toward George's method of calculating the value of Empire's assets. Moody raised this same contention in district court, whose characterization of it adequately summarizes his argument now:

Moody attacks George's testimony on the ground that, if he had employed generally accepted accounting principles rather than statutory accounting principles, he would have valued the "downstream" assets that Empire acquired through its acquisition program much higher, and may have determined that Empire was in fact solvent at the time it entered receivership. Moody alleges that George relied solely upon statutory accounting principles in forming his opinion as to the damage caused by the acquisition program to Empire and therefore his testimony does not sufficiently prove that Empire suffered actual damages.

475 F.Supp. at 240.

Statutory accounting principles ("SAP") are rules that state insurance departments have developed to regulate life insurance companies; SAP mandate that conservative methods be employed in valuing the assets of such companies to guarantee their continuing solvency. D. Gregg & V. Lucas, *Life and Health Insurance Handbook* 1048 (3d ed. 1973); D. McGill, *Life Insurance* 860–61 (rev. ed. 1967). This routine conservatism as reflected through use of SAP requires only that certain types of assets be considered in calculating a company's financial condition, and that the value of such "admitted" assets be determined according to quite restrictive rules. McGill, *Life Insurance* at 863–64. In short, it is clear that the standard practice in the life insurance industry is to determine the solvency of insurance companies by reference to SAP, even though, under generally accepted accounting principles ("GAAP"),[18] assets may be shown to have substantially greater value and might show a net equity of the company. 19 A.J. Appleman, *Insurance Law and Practice* § 10641 at 42 (1982); McGill, *Life Insurance* at 860–64; R. Strain, *Life Insurance Accounting* 353–54 (Merritt Co. ed. 1977); *In re American Investors Assurance Co.*, 521 P.2d 560, 562 (Utah 1974). George explained all of this at trial when he testified that life insurance companies are " 'run and managed' " and " 'bought and sold' " according to SAP. 475 F.2d at 242.[19]

---

**18.** On the differences between SAP and GAAP, see D. Gregg & V. Lucas, *Life and Health Insurance Handbook* 1048–49 (3d ed. 1973); S. Huebner & K. Black, *Life Insurance,* 528–80 (9th ed. 1976); D. McGill, *Life Insurance* 860–65 (rev. ed. 1967); R. Mehr, *Life Insurance* 658–

60, 673–75 (rev. ed. 1977); R. Strain, *Life Insurance Accounting,* 353–84 (Merritt Co. ed. 1977).

**19.** We are not at all certain from our reading of the record that George himself did not employ

■ The simple answer to Moody's argument about asset values is that Empire was insolvent under the law [20] and that the damages were determined after the assets had been transferred. If Moody had any support for the contention that the capital accounts would show a different balance if the assets were valued differently, he should have come forward with it.

b. *Prior Adjudication of Empire's Insolvency*

■ Moody also attacks the damages award by arguing that Receiver was relieved of the burden of proving Empire's insolvency by being permitted to stand on a prior judicial adjudication of the issue. This contention is spurious. As recounted earlier, in 1974 Receiver sought an order to liquidate Empire and approve its bulk reinsurance by Protective Life. An Alabama receivership court granted such an order in a judicial proceeding in which Empire was adjudged to be statutorily insolvent in ex-

cess of $6 million and impaired in excess of $10 million. At the close of the trial in the instant case, the district court instructed the jury that Empire had been declared insolvent in the earlier Alabama proceeding and that such finding of insolvency was "binding on the parties at this time." [21] Moody contends that this instruction relieved Receiver of the burden of proving insolvency and the amount of damages suffered by Empire. We disagree.

First, the jury had already been informed of this adjudication of insolvency during testimony at trial (to which, we might point out, no objection was made). Second, at no time was the jury ever informed of the dollar amounts by which the Alabama court found Empire to be insolvent and impaired; indeed, the district court repeatedly stressed that the amount by which Empire was found to be insolvent in the Alabama proceeding could not be used as proof of damages in the instant case. Thus, it is

GAAP when calculating the dollar amount of Empire's insolvency. At trial George presented a summary of his calculations in a graph or chart entitled "Analysis of Changes in Stockholders' Equity" for Empire covering the years 1964–72. This chart, admitted into evidence during his testimony as an exhibit (PX # 19), specifically utilizes a dollar amount representing the value of Empire's nonadmitted assets in the calculation of its equity deficit. We also note that Moody's counsel never cross-examined George or the other experts as to whether they considered the value of Empire's nonadmitted assets or relied exclusively on SAP in calculating the amount of damages suffered by Empire.

In addition, we believe that valuation of Empire's assets under GAAP would not help Moody's position. The record reveals a letter from Peat, Marwick, Mitchell & Co. to Moody dated April 2, 1965, in which Peat Marwick transmitted the unaudited financial statement it prepared for Empire for the year ending December 31, 1964. This letter is significant because it represents the first time the value of the life interest was stated at the inflated value of $14,403,200. After noting the increased valuation placed on the life interest, Peat Marwick offered this caveat to Moody:

You have informed us that this interest was acquired at no cost to the company. *In accordance with generally accepted accounting principles, the life interests in the Libbie Shearn Moody Trust should be valued at cost*

rather than the computed value as determined by the actuary [$14,403,200] or the admitted value as shown by the annual statement [$5,813,440].

(emphasis added). Thus, if Moody followed GAAP in determining the value of the life interest, he should have listed its value in Empire's annual report as either $0.00, its "no cost" value, or $200,000, the amount of the surplus debenture that Empire transferred to Moody in consideration for his original assignment of 40% of his interest in the trust to Empire. Yet Moody ignored GAAP and the advice of Peat Marwick and caused the value of the life interest to be reported to shareholders as $14,403,-200!

**20.** Alabama law expressly employs the use of SAP in calculating the solvency of life insurance companies. The Alabama Insurance Code very plainly spells out what kinds of insurance company assets are to be admitted or rejected. Ala.Code §§ 27–37–1, 27–37–2 (1975). These or similar statutory provisions have been in effect in Alabama since Empire began its acquisition program in the 1960s and were in force in 1972 at the time of its insolvency.

**21.** We note that Moody, in his reply brief, admits that he intervened as a codefendant with Empire in the Alabama proceeding brought by Receiver; as a result, he is bound by the adjudication there of the fact of Empire's insolvency.

impossible that the jury could have relied on the adjudication of the Alabama court in calculating the $5 million damage award it returned. Moreover, Receiver obviously did not purport to rely upon the Alabama adjudication as proof of the amount of damages that Empire suffered, but instead tendered the exhaustive testimony of George and other experts which we have already discussed.

#### c. *Moody's Day of Judgment*

 Punitive damages are not recoverable in a Rule 10b–5 action, but may be recovered under pendent state claims.[22] *Petrites v. J.C. Bradford & Co.,* 646 F.2d 1033, 1036 (5th Cir.1981). Moody argues that the district court erred in failing to instruct the jury that it could not consider any securities law violations in assessing punitive damages. Moody did not object at trial to the court's failure to give this cautionary instruction, however, and such failure may not now be assailed on appeal. Fed.R.Civ.P. 51. It is true that even absent objection we may consider errors in jury instructions that seriously affect the fairness and integrity of the proceedings. *Delancey v. Motichek Towing Service, Inc.,* 427 F.2d 897, 901 (5th Cir.1970); *Dunn v. Sears, Roebuck & Co.,* 639 F.2d 1171, 1176 (5th Cir.1981). However, Moody's wrongful conduct was the same whatever the basis of legal liability, and the court's failure to include a cautionary instruction relative to the legal basis for punitive damages could not result in a miscarriage of justice.

### D. *Motion for Mistrial*

Moody raises one final argument for our consideration. He claims that the district court erred in failing to grant his motion for a mistrial based upon the allegedly prejudicial comments made by counsel for Receiver during closing jury argument. First, Moody claims that he was compared to Adolph Hitler. This claim is not entirely accurate. At one point during the exami-

nation of Richard E. Linn (an accountant with Empire and witness at trial) the parties were discussing a memorandum from Moody in which he issued directions to Empire's "field units." In trying to ascertain what Moody meant by the term "field units," counsel for Receiver commented that the term originated with Adolph Hitler in World War II. Counsel for Moody objected and the district judge sustained the objection.

Moody also claims that he was unfairly likened to criminals widely known by the public. This also occurred during closing jury argument of counsel for Receiver:

> The Court will instruct you that the insolvency of Empire Life Insurance Company of America has been determined by a court which Mr. Moody was a part of and he's further going to instruct you that the motives of the people that put it into insolvency are not relevant, are not material to any issue in this case. But, having heard the argument, let me remind you that everybody from Ben Jack Cage to Billy Sol Estes to Shearn Moody that's been in a suit like this has claimed politics and, indeed, Richard Nixon and Mr. Agnew have the same claim and they all, whenever there's no other defense, attack the attacker.

> In many ways, this case has been tried a little bit like a rape case. You don't defend yourself against the crime, you attack the integrity of the people who were had, who were injured. You attack the witnesses.

Moody did not object to these allegedly prejudicial comments at the time they were made, although he did object to them and moved for a mistrial upon a completion of Receiver's closing argument. The district court denied the motion for mistrial.

 It is well-established that a motion for new trial based upon inflammatory remarks is addressed to the sound discretion of the trial judge, and his ruling thereon

---

**22.** Texas law permits punitive damages to be recovered under the facts of this case. *See Collins v. Miller,* 443 S.W.2d 298 (Tex.Civ.App. —Austin 1969, writ ref'd n.r.e.); *Williams B.* *Roberts, Inc. v. McDrilling Co.,* 579 S.W.2d 335, 340 (Tex.Civ.App.—Corpus Christi 1979, no writ).

will not be disturbed absent an abuse of that discretion. *International City Bank & Trust Co. v. Morgan Walton Properties, Inc.,* 675 F.2d 666, 669 (5th Cir.1982); *Crown Colony Distributors, Inc. v. United States Fire Insurance Co.,* 510 F.2d 544, 545 (5th Cir.1975). In the instant case, although the comments by Receiver's counsel may have been unnecessary and even unfortunate, we cannot say that the district judge abused his discretion in denying a motion for a mistrial. These comments occurred in two isolated and brief instances during the course of an extremely long and otherwise fairly litigated trial. From our review of the record, we cannot say that the " 'conduct of [Receiver's] counsel was such to impair gravely the calm and dispassionate consideration of the case by the jury ....' " *Crown Colony,* 510 F.2d at 545. We are convinced that the verdict in this case is rationally based on the convincing evidence at trial and is not the product of an impassioned jury swayed by a few passing references made by Receiver's counsel.

AFFIRMED.